**Marvin L. HARBER, Appellant,**

v.

**The OHIO NATIONAL LIFE INSURANCE COMPANY, Appellee.**

**No. 74–1637.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 9, 1975.

Decided Feb. 26, 1975.

Paul H. Schramm, St. Louis, Mo., for appellant.

John P. Emde, St. Louis, Mo., for appellee.

Before GIBSON, Chief Judge, HEANEY, and ROSS, Circuit Judges.

GIBSON, Chief Judge.

Marvin L. Harber appeals from a judgment entered by the District Court [1] in favor of defendant, The Ohio National Life Insurance Company, in this damage action for breach of a General Agent's contract and for tortious interference with contractual relations.

Harber, with ten years insurance selling experience, sought in 1968 to move into agency management. In August, 1969, after unsuccessfully applying to General American Life Insurance Company, he was appointed St. Louis General Agent for Ohio National. He was compensated on a supplemental basis for establishing his own agency using the company's prearranged Three-Man Model plan (under which he would recruit and train three new agents a year for five years, retaining at least one per year).

1. The Honorable H. Kenneth Wangelin, United States District Judge for the Eastern and Western Districts of Missouri, filed a memorandum opinion July 12, 1974. See 390 F.Supp. 678 (W.D.Mo.1974).

During pre-contract negotiations with Ohio National, Harber carefully explained his intention to continue selling in the St. Louis black community and to recruit black and Caucasian producing agents. Ohio National agreed that during the ten years prior to 1969 he had achieved satisfactory results. In 1969 he was selling policies primarily on annual and semi-annual premium payment terms, many using automatic bank collection (ABC) devices for premium payment, a type of business that interested Ohio National because it insured high client "persistency." [2]

The General Agent's contract was signed August 16, 1969. Harber's first recruit as a producing agent was Jack Nelson, a black man, who started on January 1, 1970, and operated successfully until he resigned in August of 1970; his second was Patrick Heaney, a white man, whose services were terminated by Harber as unsatisfactory. Garfield W. Boon, another black man and a novice in the insurance business, started in June 1970, after some delay in obtaining his Missouri license. [3]

When Boon began to submit applications for insurance during late June and July 1970, the home office called into question the "quality" of his business. The company had achieved one of the highest persistency ratios in the industry—88%—by emphasizing the importance of an applicant's occupation, income, place of residence and social conditions in projecting persistency. Five of Boon's eleven applicants were unemployed and resided in public housing projects where the Retail Credit Company's inspectors refused to tread for reasons of personal safety. The company, however, issued policies to all of Boon's applicants because they appeared to be of good moral character. It does not follow, however, that the quality of Boon's business was up to company standards or that his persistency rating would be favorable. In fact, the company viewed his business as substandard.

On July 23, 1970, the company's Regional Agency Manager, William Witte, discussed with Harber the fact that Boon's applications were all drawn on monthly or quarterly premium modes by low income clients, some unemployed. He recited other disturbing factors as well which indicated bad risks from the company's point of view. Consequently, Witte ordered Harber to restrict Boon to selling semi-annual or annual premium policies, prohibiting monthly or quarterly payment unless by ABC draft, and to require Boon to mail a "persistency rater" to the home office as well as to the General Agent with each application. Additionally, Boon was required to submit cash payments with each application and was prohibited from offering c.o.d. policies.

While there was conflicting evidence concerning whether Harber disagreed as to the wisdom of imposing the restrictions, he and the company realized that the new rules would likely curtail Boon's chances of succeeding as an insurance salesman. For that reason Harber reluctantly informed Boon in writing on July 24 that by order of the home office he (Harber) was no longer authorized to accept applications under liberal payment terms. Boon accepted the restrictions with what Harber described as a "rather philosophical" reaction. [4] During the

---

**2.** "Persistency" is a concept employed in the insurance industry to quantify the percentage of an agent's clients who continue their insurance in force for at least 13 months. Ohio National has had success in concentrating on persistency predictions when deciding whether to underwrite tendered applications for insurance.

**3.** Because of an incident reported in Boon's employment record, the State of Missouri required Ohio National to assume responsibility for his future conduct as an agent, which the company readily agreed to do.

**4.** In his July 24, 1970, letter to Regional Manager Witte in the home office after informing Boon of the restrictions, Harber stated in part:

* * * Frankly, I was extremely surprised at Garfield Boon's rather philosophical attitude on the decision which I had to take regarding the mode of premium of his policies * * *.

Garfield feels that the Company's decision to restrict his policies to the Annual, Semi-Annual and/or ABC forms of remittances will help him immeasurably in upgrading

month of August, however, Boon encountered serious difficulty operating under the restrictions; he sold insurance to only one of approximately 160 prospects.

On August 3, 1970, Harber approached General American Life Insurance Company to discuss a possible association with it in light of the management experience he had acquired since his prior inquiry in 1969. Soon thereafter, effective August 15, 1970, he was appointed General Agent for General American, and on August 17 he voluntarily terminated his Ohio National agency contract, leaving Boon without supervision and Ohio National without a St. Louis general agent. Harber accomplished the termination lawfully under the terms of his contract.[5]

Harber's remaining producing agent, Jack Nelson, resigned August 17, 1970, after only seven months in the agency because he considered Ohio National's restrictions upon Boon to have been unfair and harsh and he feared the same would be imposed upon him. Finally, on August 31, 1970, Boon resigned as well and went to work for Harber with General American. Harber filed suit against defendant Ohio National in November, 1971.

This diversity case was tried to the court, without a jury, with the court finding: (1) that Ohio National committed no material breach of its general

agency contract with Harber, and (2) that, in addition to Harber's lack of standing to assert Boon's claim, any intentional interference which Ohio National may have committed with Harber's contractual or business relationships was not actionable because fully justified.

## I.   *The Contract Claim.*

Harber argues that the trial court's conclusion that Ohio National committed no material breach of its contract with him is clearly erroneous. In his view Ohio National had no right to impose the restrictions, and by doing so it breached its contract with Harber by creating chaos in his agency and involving him in an "insidious and deceptive," racially motivated scheme to eliminate Boon and thereby prevent Harber from performing his own contractual obligations.

He argues that the essence of his August, 1969, agreement with Ohio National contemplated sales in the high risk, low income sections of the St. Louis black community, using liberal payment terms with an aim toward later upgrading to a better class of insurance business.[6] Because such liberal terms were contemplated as essential in Harber's market, he argues, the company breached the contract when it imposed more restrictive terms upon Boon without publishing them as new uniform company regulations.

---

his prospecting. As a matter of fact to quote Garfield, he says "my thinking is right along with theirs and the evidence is in the type of activity I have had this week" * * *

* * * * * *

* * * However, there is little doubt in my mind that his growth will be severely stunted because of the decision to not accept quarterly business and I am not attempting in any way to ask for any appeal of this decision at this time.

**5.** Clause XIII B of Harber's Ohio National general agent's contract reads:

B. *Termination by Notice.* This Contract may be terminated with or without cause by either party hereto upon written notice to the other party.

Boon's and Nelson's Ohio National producing agent's contracts contained identical provisions.

**6.** Harber's contentions are clearly undermined by his own admissions in general agency quarterly objectives which he signed as part of his agency plans in 1969 and early 1970. To achieve 90% persistency his agents were told that they "should" follow a policy of accepting no monthly or c.o.d. business and encouraging ABC plans. Such restrictions, with the exception of quarterly business, were substantially similar to those imposed on Boon and are recognized as desirable and necessary underwriting practices. In addition to conforming to Harber's present practice, they were later used by Boon as well during his subsequent production for another company in 1972 when he sold 176 policies with less than 10% in the monthly premium mode.

The contract in question is a standard printed form prepared by the defendant. Along with various supplemental agreements, it authorized Harber to operate as an independent contractor and to recruit producing agents as independent contractors for the home office, not as Harber's employees.[7] In some key respects the general and producing agents' contracts were effectively identical. One such provision in Harber's and Boon's contracts reads in part:

### V. COMPANY RULES—RELATIONSHIP

The General Agent [or Producing Agent] shall observe and conform to such rules and regulations as the Company, from time to time, shall publish relating to its underwriting practices, the acceptance of risks, and the delivery of policies, or otherwise relating to the general conduct of business.

In denying Harber's claim, the District Court concluded that Section V of the general agent's contract afforded the defendant sufficient contractual authority to impose the premium restrictions unilaterally on Harber's producing agent, Boon.[8]

■■■ On the issues raised, the contract is free from ambiguity, and its proper construction will be undertaken by the court as a question of law. Petticrew v. Petticrew, 98 Ohio App. 260, 129 N.E.2d 194, 199 (1953), appeal dismissed, 161 Ohio St. 118, 117 N.E.2d 706 (1954); Monnett v. Monnett, 46 Ohio St. 30, 17 N.E. 659, 660, 663 (1888).[9] The contract is not rendered ambiguous merely by reason of the fact that its operation will work a hardship on one of the parties and corresponding advantage on the other. Ullmann v. May, 147 Ohio St. 468, 72 N.E.2d 63, 67–68 (1947).

On this record it is difficult to tell who suffered the most hardship. The company sought entry into the St. Louis area for multi-racial insurance business. It obtained some eleven months operation, relatively few policies, some of which were substandard viewed from an insurance underwriting perspective, and lost its general Agent, Harber, an experienced insurance man. Harber lawfully terminated the General Agent's contract after gaining the year's experience necessary for him to be considered as a General Agent for General American Life Insurance Company. He lined up his General American connection before terminating with the defendant company.

■ After reviewing the extensive record and briefs in the case, we think the trial court properly interpreted the contract in accordance with the parties' intent as gathered from the language they employed in the written instrument and supplemental materials.[10] Monnett v. Monnett, *supra* 17 N.E. at 663; Gillen-Crow Pharmacies, Inc. v. Mandzak, 8 Ohio Misc. 47, 220 N.E.2d 852, 861 (1964), aff'd, 5 Ohio St.2d 201, 215 N.E.2d 377

---

7. Section II A of Harber's contract reads:

   A. *Recruiting, Training and Supervision.* The General Agent shall recruit and recommend persons for appointment by the Company as Agents within his agency and territory and shall properly train and supervise such Agents in the performance of their duties.

8. The court rejected, as untenable in the context of the contract and the circumstances of the case, Harber's proposed construction of Section V's term "publish" as requiring Ohio National to make the restrictions more "generally known."

   As an indication that the restrictions were indeed disseminated beyond Harber's agency, the court noted that in March 1970, Ohio National had placed restrictions on monthly premium business to increase persistency in its Pacific Coast Region. Thus, substantially similar restrictions were placed on other agents of the company prior to those placed on Boon.

9. In Section XII H the parties agreed that the contract is to be construed according to Ohio law.

10. Both the general and producing agents' contracts state in clause XII F:

    F. *Entire Contract.* This Contract represents the entire agreement between the parties hereto. No modification * * * shall be binding * * * unless made in writing and signed by * * * the Company * * *.

    Harber does not contend that the parole evidence rule is inapplicable to the instant case.

(1966); Cleveland Trust Co. v. Hickox, 32 Ohio App. 69, 167 N.E. 592 (1929). Harber's contention that liberal premium payment terms and low persistency underwriting were specifically agreed to by the defendant in its contract lacks support in the record.

Harber's allegation of racial bias and discrimination in Boon's company-imposed restrictions appears clearly unwarranted and supplies no basis for the lawsuit. The company wanted business from the black citizens of St. Louis. It knew Harber and his producing agents would be soliciting black business. It was satisfied with the business generated by Harber and Jack Nelson, but not with Boon's, and it gave Boon a chance to upgrade his business. It was, however, free to cancel Boon's contract with or without cause.[11] Harber is basically rearguing his factual theory and has failed to show the District Court's factual findings to be clearly erroneous as required by Rule 52(a), Fed.R.Civ.P.

II. *The Tort Claim.*

In his tort claim Harber argues that the company's scheme to oust Boon by imposing restrictions upon him was a tortious interference with Harber's general agency contract and likewise an interference into Harber's business relations with his producing agents. The District Court found that Harber lacked standing to vindicate Boon's contract rights as a producing agent; that the

defendant's conduct fell short of actionable interference with Harber's business relationships; and that the restrictions imposed upon Boon, founded upon proper contractual authority, were justified for legitimate business reasons.

■ Although Harber's complaint may have stated a cause of action for tortious interference (Harber by contract being entitled to an override on business produced by Boon), Downey v. United Weather Proofing, Inc., 363 Mo. 852, 253 S.W.2d 976, 980–81 (1953),[12] the absence of justification for the defendant's conduct is an essential element in such a claim for relief under Missouri law. Cady v. Hartford Accident & Indemnity Co., 439 S.W.2d 483, 485 (Mo.1969).[13] The District Court's conclusion that Ohio National was justified in imposing the restrictions was a factual finding that cannot be set aside by this court unless clearly erroneous. Rule 52(a), Fed.R. Civ.P.

With that principle in mind, and without addressing the other possible defects in Harber's tort claim, we believe the factual material in the record, interpreted most favorably to Ohio National, amply supports the District Court's conclusion that the defendant's conduct was justified and thus not actionable by Harber. There was adequate evidence from which the District Court could and did find that the defendant's restrictions were prompted by reasonable insurance underwriting principles.[14]

---

**11.** Producing Agent's Contract clause XIII B, note 5, *supra.*

**12.** *See generally* Restatement of Torts § 766 (1939); Smith v. American Guild of Variety Artists, 349 F.2d 975, 980–81 (8th Cir. 1965), vacated and remanded on other grounds, 384 U.S. 30, 86 S.Ct. 1283, 16 L.Ed.2d 332 (1966) (Minn. law).

**13.** *See also* American Surety Co. v. Schottenbauer, 257 F.2d 6, 11–12 (8th Cir. 1958); Restatement of Torts § 767 (1939); 1 F. Harper & F. James, Jr., The Law of Torts § 6.12 (1956); W. Prosser, The Law of Torts § 123 (3d ed. 1964).

**14.** The court noted, for example, a passage from Ohio National's *Field Underwriter's Manual:*

GENERAL UNDERWRITING RULES
*Questionable Classes of Business*
Economic and social conditions and personal habits have a significant effect on both mortality and morbidity rates of life and health insurance among policyholders as well as on expense and lapse rates of policies.
*General.* Individuals and families living in slum neighborhoods, under congested and overcrowded conditions, in unhealthy and undesirable surroundings, with low or uncertain income, under circumstances, where there is high incidence of tuberculosis, influenza, pneumonia, syphilis, or other communicable disease, where infant and maternal mortality is high, in neighborhoods where homicide, accident, and crime rates are high, and in squalid home surroundings

Additionally, Harber argues that the defendant's bad faith intention merely to oust Boon for reasons of racial prejudice, not to upgrade Boon's performance, should preclude it from justifying its tortious conduct. He failed, however, to convince the trier of fact that bad faith or discrimination of any unlawful nature was involved.[15] Agent Boon evidently wrote inferior business and the defendant lawfully responded by restricting Boon's future actions in soliciting business.

In light of the fact that the defendant could have lawfully terminated Boon for any reason or no reason under the terms of his contract, its practice of building a case against him because of his minority race may have been overly cautious at best and unnecessary. But in view of the complexity of today's laws regulating employment discrimination and the conduct of companies in the highly regulated insurance industry, this court must recognize that a company has a right to be cautious.

The judgment of the District Court is affirmed.

even in a desirable community, produce mortality and persistency results which do not meet our Company standards. *Persons in these environmental situations should not be solicited.* (Emphasis in original.)

15. The July 27, 1970, out-of-context statement by the defendant's Vice-President Warnemunde, upon which Harber relies, loses its discriminatory significance when read in the entire context of Warnemunde's letter.