536 F.2d 1233
 Sidney SALOMON, Jr., et al., Appellees,
v.
CROWN LIFE INSURANCE COMPANY, Appellant.
CROWN LIFE INSURANCE COMPANY, Appellant,
v.
SIDNEY SALOMON, JR. & ASSOCIATES, INC., et al., Appellees.
Sidney SALOMON, Jr., et al., Appellants,
v.
CROWN LIFE INSURANCE COMPANY, Appellee.
 Nos. 75-1537, 75-1538 and 75-1544.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 8, 1976.
Decided June 23, 1976.
 
 Lon Hocker, Ziercher, Hocker, Tzinberg, Human & Michenfelder, Clayton, Mo., Robert S. Allen, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for Crown Life Ins. Co.
 Thomas J. Guilfoil, Jim J. Shoemake, and Irvin L. Ruzicka, Guilfoil, Symington & Petzall, St. Louis, Mo., for Salomon and others.
 P. Terence Crebs, St. Louis, Mo., made argument and filed appearance for Portnoy-Tessler & Associates, Inc.
 Before LAY, ROSS and STEPHENSON, Circuit Judges.
 STEPHENSON, Circuit Judge.
 
 
 1
 The central issue on these combined appeals concerns a claim of tortious interference with contractual and business relations under Missouri law. The district court,[1] sitting without a jury in this diversity case, found that Crown Life Insurance Company (Crown), a Canadian corporation doing business in Missouri, had tortiously interfered with certain contractual relationships between Sidney Salomon, Jr. and Sidney Salomon, Jr. & Associates (Salomon Associates), an insurance broker and general agent for Crown, and three of their employees by conspiring with these employees while they were in Salomon Associates' employ to terminate their contractual and employment relationship with Salomon Associates and to set up a superseding insurance agency to act as general agent for Crown in Missouri. Salomon v. Crown Life Insurance Co., 399 F.Supp. 93 (E.D.Mo.1975). A judgment of approximately $900,000 actual damages and $750,000 punitive damages was entered by the court against Crown. The district court denied any relief on a similar claim of tortious interference brought by intervenor Portnoy-Tessler & Associates, Inc. Crown's action for the recovery of certain insurance records from the joint venture involving the Salomon appellees was denied.
 
 
 2
 We reverse the district court's damage award, having concluded upon the record that plaintiff has failed to establish its claim of tortious interference under Missouri law. We also reverse the trial court's denial of Crown's demand for the insurance records kept by the joint venture. The district court's denial of relief to intervenor Portnoy-Tessler & Associates, Inc. is affirmed.
 
 I.
 
 3
 Our disposition of the tortious interference claim against Crown is based upon our firm conviction after a review of the entire record that a mistake has been committed. We are, of course, guided by the well established proposition that as an appellate court we must take that view of the evidence and accept such reasonable inferences therefrom as tend to support the trial court's conclusions. See Lindsay v. McDonnell Douglas Aircraft Corp., 485 F.2d 1288, 1289 (8th Cir. 1973); Higgins v. Kitterman, 257 F.2d 861, 866 (8th Cir. 1958). Extensive specific reference will be made to that record throughout this opinion. However, at the outset we shall provide as a background a summary of the relevant facts and the procedural history of this litigation.
 
 
 4
 Appellant Crown Life Insurance Company is a Canadian corporation which has, since 1946, been engaged in the sale of life insurance in the greater St. Louis area. Appellee Sidney Salomon originally became a general agent for Crown in 1946. His business relationship with Crown continued until August 9, 1972, at which time Crown terminated the general agency with which he had been most recently associated. Salomon's business relationship with Crown during that 26 year period took a number of different corporate and business forms. From 1946 to 1949 a company which Salomon owned jointly with appellant Joyce Portnoy was the sole Crown general agent in St. Louis. In 1949, Robert Hannegan became a party to a new general agency contract with Crown in conjunction with Salomon and Portnoy. That general agency contract was in effect until 1957, at which time Crown entered into two separate general agency contracts, one with appellant Sidney Salomon, Jr. & Associates (Salomon Associates), the other with appellant Portnoy-Tessler & Associates, Inc.
 
 
 5
 On May 15, 1971, a joint venture under the name Sidney Salomon, Jr. Life Assurance Agency was formed between Salomon Associates and Insurance Consultants, Inc. (ICI), for the purpose of representing Crown under a general agency contract. The prior general agency contract between Salomon Associates and Crown was terminated voluntarily by Sidney Salomon that same year. The general agency contract issued to the joint venture was officially terminated by Crown on August 9, 1972, under the 30 day notice provisions of the contract. That action precipitated this lawsuit.
 
 
 6
 During the course of the Salomon-Crown relationship, Sidney Salomon, Jr. was involved in a wide range of activities in addition to the sale of life insurance. At various times he owned interests in three baseball teams including the St. Louis Cardinals. From 1967 to the present time he has been chairman of the board of the St. Louis Blues hockey team. Salomon has also been an active participant in Democratic party politics. He has served as national treasurer and as a national committeeman for Missouri. In addition, Salomon owns a hotel in Miami, commercial property in St. Louis, and a farm in Missouri where he is personally involved in the breeding and raising of show horses.
 
 
 7
 Salomon asserts that all of these activities contributed to his considerable success as a life insurance agent inasmuch as he employs a "center of influence" approach to the sale of insurance. This theory is based upon the concept that insurance sales will be enhanced by activities which not only bring the agent in contact with a broad spectrum of influential people, but also make the purchase of insurance from that agent more attractive and advantageous. Through the use of this method, Salomon became a top producer for Crown. Over the years, the corporate entities with which he was associated received numerous commendations from Crown for their sales efforts.
 
 
 8
 One aspect of Salomon's approach to the sale of life insurance involved the recruiting of brokers to be trained at Salomon's expense for the purpose of handling the business that Salomon attracted. Two such men were James T. Blair III and Robert Klostermeyer. They began working for Salomon in 1957 and 1961 respectively. After their training period, each man became a broker for the successive general agencies in which Salomon had an interest. Once trained, their primary compensation derived from commissions earned on the sale of life insurance policies. These two men, along with W. Andrew Bradley, became the focal point of the controversy between Salomon and Crown which arose in the summer of 1972.
 
 
 9
 In 1970, Salomon Associates, a general agent for Crown at that time, moved its business offices into the general headquarters of ICI, a large insurance brokerage in St. Louis County, Missouri. Salomon maintained an office at ICI but, as the record reveals, he spent the majority of his time at his office in the Arena, a sports complex which he owned and which was used by the St. Louis Blues hockey club.
 
 
 10
 In the spring of 1971, Salomon Associates and ICI entered into a joint venture for the purpose of representing Crown as general agent under the name Sidney Salomon, Jr. Life Assurance Agency. Under the joint venture agreement, ICI was managing partner of the enterprise and provided it office space within its general headquarters. Profits were to be shared equally after ICI's initial $20,000 capital investment was recouped.
 
 
 11
 By mid-April 1971, the joint venture had been approved by the respective boards of directors and shareholders. Blair, Klostermeyer and Bradley became brokers for the joint venture. In addition, Klostermeyer served as business manager and Bradley as bookkeeper and cashier. Brokers contracts were issued accordingly, appointing these men as brokers for the general agent, the joint venture doing business as Sidney Salomon, Jr. Life Assurance Agency.
 
 
 12
 Crown was initially informed of the creation of the joint venture in May 1971. The general agency contract to the joint venture by Crown was dated September 13, 1971. The prior general agency contract with Salomon Associates had been cancelled on July 26, 1971, pursuant to a letter requesting such cancellation by Sidney Salomon, Jr.
 
 
 13
 By June 30, 1972, little more than a year after its creation, the joint venture had lost about $35,000. At about this time, Sidney Salomon, Jr. and ICI President Lee Kling met to discuss the future of the joint venture. What was decided as a result of these discussions is in dispute. Sidney Salomon, Jr. contends that he and Kling decided to "make some different arrangements" in order to "let him operate his ICI operations (and) I would operate my operations." According to Salomon's testimony, Kling gave him "carte blanche to do anything I wanted to do," including seeking separate general agency contracts with Crown for ICI and Salomon Associates. Salomon indicated that future plans with regard to the employment of Klostermeyer, Blair and Bradley were not discussed. Kling's deposition testimony[2] indicates that he and Salomon agreed to financially bifurcate the operations of the joint venture pending approval of two separate general agencies by Crown. However, a memorandum circulated by Kling among ICI personnel shortly after this meeting stated flatly: "Effective July 1st, Insurance Consultants will take over the complete management and operation of the Joint Venture life insurance agency. The profit and loss of same will be the 100% responsibility of Insurance Consultants."
 
 
 14
 On July 5, 1972, joint venture business manager Klostermeyer, at the invitation of Crown, traveled to the Toronto home offices of Crown for a series of meetings with various officers. Just prior to his departure from St. Louis, Klostermeyer was called into Kling's office and informed of the discussions he had had with Salomon with regard to the termination of the joint venture. Kling testified that he informed Klostermeyer as to the substance of the memorandum he had prepared outlining the changes in the joint venture, including the fact that Klostermeyer would no longer be on salary from the joint venture, but would instead receive a commission on the life insurance placed by all ICI brokers. He wanted Klostermeyer to be informed as to the situation so that he would not be caught unaware if the subject came up while he was in Toronto. Kling did not remember whether he told Klostermeyer that all these changes were contingent upon Crown's approval. Klostermeyer's testimony basically confirms Kling. He stated that Kling informed him that the joint venture was terminated, that he had been fired as business manager of the joint venture, and that he could continue to work for ICI on a commission basis. Blair testified that Kling told him on that same day that "Sid (Salomon) wants out and we're going to take over the operation of the life insurance business."
 
 
 15
 Upon arrival in Toronto, Klostermeyer informed Crown officials that the Salomon Associates-ICI joint venture had been terminated by agreement of the parties. He stated that the source for this information was ICI President Kling. During the course of these conversations, Klostermeyer indicated that he was interested in participating in whatever new general agency setup Crown arranged in St. Louis to supersede the reportedly defunct joint venture. On or about July 7, 1972, Klostermeyer contacted Blair and Bradley to determine whether they would be interested in applying for a new general agency contract with Crown in St. Louis. Shortly thereafter, Klostermeyer directed Bradley to begin looking for office space to house the tentative new general agency.
 
 
 16
 There is evidence in the record as to three significant phone conversations in July between Crown officials and Miss Ruth Hall, Salomon's private secretary and assistant, which are related to the tortious interference claim. On July 6, Hall called Mr. David Williams, a Crown official in Toronto, and informed him that both Salomon and ICI wanted general agency contracts. Later that day Williams informed Hall by telephone that ICI would not be given a contract. According to Hall's testimony, Williams also stated that "Sidney could always have one." Klostermeyer, who was in Williams' office during both phone conversations with Hall, testified he heard no such remark by Williams. Williams' deposition indicates that Miss Hall informed him during the initial telephone conversation that the joint venture had been terminated, that two general agency contracts were requested and that the brokers formerly with Salomon would probably be working with ICI. Subsequently, on or about July 11, 1972, Miss Hall spoke by telephone with William Bowden of Crown and relayed the message that Salomon, in the face of Crown's refusal to grant a general agency contract to ICI, would give ICI a sub-general agency contract under his contract. Hall stated that Bowden replied "that was different from what I heard" but did not elaborate.
 
 
 17
 On July 24, 1972, Clarke Lloyd, Crown's senior vice president for United States agencies, conferred with Sidney Salomon, Jr. in Salomon's St. Louis Arena offices. Notes made during that meeting indicate that these men discussed Salomon's future with Crown. It is apparent from these notes that no final accord was reached at that time. A number of different corporate and financial configurations involving Crown and Salomon were suggested during the course of the all-day meeting. However, Salomon indicated that his post-joint venture relationship with Crown was contingent upon the formation of a new general agency in St. Louis bearing his name and with him as president. Salomon stated that he would invest no capital in the agency nor would he be responsible for its management. But, he wanted to receive 25% of the gross profits in addition to retaining his full renewal commissions and collection fees. These terms were to be relayed by Lloyd to the Crown home office for consideration.
 
 
 18
 Following this meeting, there is evidence that the Crown officials discussed Salomon's demands and determined that they did not wish to comply with them. The role to be played by Sidney Salomon in any future Crown general agency in St. Louis was left to be determined by Klostermeyer as the primary moving force in a new general agency. Klostermeyer ultimately rejected the terms upon which Salomon conditioned his continuing association with Crown.
 
 
 19
 On July 28, 1972, Klostermeyer, Blair and Bradley incorporated Crown Associates of St. Louis, Inc., the eventual recipient of a general agency contract from Crown. On August 9, 1972, Crown sent letters of termination to the joint venture addressed to the Sidney Salomon Life Assurance Agency. The general agency contract between Crown and the joint venture was terminable upon 30 days notice by either party. A similar letter of termination was sent to appellant Portnoy-Tessler & Associates, Inc. Crown Associates of St. Louis, Inc. was appointed general agent for Crown on September 28, 1972. That contract made the appointment retroactively effective to August 15, 1972. Despite the termination, Sidney Salomon continues to receive certain vested renewal commissions from Crown.
 
 
 20
 This action was commenced by the Salomon appellees in September of 1972. The matter came on for trial by the court in October 1974. Orders and a memorandum were filed on March 4, 1975, awarding Sidney Salomon & Associates a judgment against Crown in the amount of $894,784.44 actual damages, and $750,000 punitive damages. Judgment was entered for Crown against intervenor Portnoy-Tessler & Associates, Inc. These appeals followed.
 
 II.
 
 21
 In this diversity case we are, of course, applying the substantive law of Missouri. The theory of recovery in the instant case is based upon tortious interference with contractual or business relations. In order to establish a claim of tortious interference under Missouri law, the following elements must be established:
 
 
 22
 (1) A contract or a valid business relationship or expectancy (not necessarily a contract);
 
 
 23
 (2) Defendant's knowledge of the contract or relationship;
 
 
 24
 (3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;
 
 
 25
 (4) The absence of justification; and,
 
 
 26
 (5) Damages resulting from defendant's conduct.
 
 
 27
 See Harber v. Ohio Nat'l Life Insurance Co., 390 F.Supp. 678, 683 (E.D.Mo.1974), aff'd, 512 F.2d 170 (8th Cir. 1975). See also Clark-Lami, Inc. v. Cord, 440 S.W.2d 737, 741 (Mo.1969); Downey v. United Weather Proofing, Inc., 363 Mo. 852, 253 S.W.2d 976 (1953).
 
 
 28
 The essence of the district court's finding that Crown was liable to Salomon for tortious interference with his contractual or business relations is as follows:
 
 
 29
 It is obvious to the Court that defendant Crown conspired with certain of plaintiffs Salomon's employees to end the relationship which had existed between the parties for a number of years. Such a termination is certainly not wrong, and was well within the rights of defendant Crown, however, defendant Crown injured the plaintiffs Salomon by its successful subversion of plaintiff Salomon's employees and agents prior to the termination of the contract. Such subversion clearly constituted what this Court feels is a tortious interference with contractual relationships. The overall demeanor of the defendant Crown in this matter was one of underhanded and deceptive dealing. It must be noted that the Court finds no wrong in terminating the contract between the parties, the Court finds the wrong in the defendant Crown's dealing with plaintiffs Salomon's agents before the termination of the contractual relationship.
 
 
 30
 399 F.Supp. at 99. Basically, the scope of our review in this appeal is confined to that general finding and the various specific findings of fact that relate to it.
 
 
 31
 The standard of review to which we adhere in evaluating the district court's findings of fact is well established.
 
 
 32
 Our review is limited by Rule 52(a), Federal Rules of Civil Procedure. We cannot review the case de novo. We view the evidence in the light most favorable to the prevailing party, and we cannot reverse the trial court unless we should find that its findings are clearly erroneous.
 
 
 33
 Mears v. Olin, 527 F.2d 1100, 1103 (8th Cir. 1975). In addition, as this court stated in Cole v. Neaf, 334 F.2d 326, 329 (8th Cir. 1964):
 
 
 34
 We have repeatedly and consistently held, at least subsequent to the Supreme Court's decision in Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218, that the clearly erroneous standard applies to reasonable inferences to be drawn from stipulated or undisputed facts and that it is for the trial court rather than this court to draw legitimate and permissible inferences.
 
 
 35
 (Citations omitted.) See Jarvis v. Montgomery Ward and Co., 525 F.2d 1267 (8th Cir. 1975); Moorhead Construction Co. v. City of Grand Forks, 508 F.2d 1008, 1012 (8th Cir. 1975); Wellner v. Minnesota State Junior College Board, 487 F.2d 153, 156 (8th Cir. 1973); Jackson v. Hartford Accident and Indemnity Co., 422 F.2d 1272 (8th Cir.), cert. denied, 400 U.S. 855, 91 S.Ct. 86, 27 L.Ed.2d 92 (1970). Further, we recognize that
 
 
 36
 the complaining party has the burden to clearly demonstrate error in the court's findings. This is a strong burden where, as here, the findings are primarily based upon oral testimony and the trial judge has viewed the demeanor and credibility of witnesses. Chalk v. Beto, 429 F.2d 225, 227 (5th Cir. 1970); St. Louis Typographical Union No. 8 v. Herald Company, 402 F.2d 553, 557 (8th Cir. 1968), and cases cited therein.
 
 
 37
 Snodgrass v. Nelson, 503 F.2d 94, 96 (8th Cir. 1974).
 
 
 38
 Nevertheless, our careful analysis of the entire record in light of these standards leaves us "with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). See also Zenith Corp. v. Hazeltine, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); Smith v. Anchor Building Corp., --- F.2d ---- (8th Cir. 1976); Birdwell v. Hazelwood School District, 491 F.2d 490, 494 (8th Cir. 1974). The district court's finding that the requisite elements of tortious interference by Crown were established in the instant case is clearly erroneous.
 
 III.
 
 39
 Before analyzing the district court findings that specifically relate to the elements of a cause of action for tortious interference, it is essential that we carefully define the scope of our inquiry so as to eliminate any consideration of irrelevant facts which may tend to color the issues herein involved. The sole contention by the Salomon appellees is that Crown wrongfully conspired with Kostermeyer, Blair and Bradley to terminate their relationship with Salomon and set up a superseding insurance agency, thus interfering with and inducing a breach in his contractual and business relations with these employees. No claim has been made with regard to any wrongful termination by Crown of the general agency contract held by the joint venture doing business as Sidney Salomon, Jr. Life Assurance Agency. The district court specifically found that such termination was valid under the terms of the contract. 399 F.Supp. at 99. That finding is clearly established.
 
 
 40
 Further, although Klostermeyer, Blair and Bradley are alleged to have wrongfully conspired with Crown, they are not made defendants in this suit. Thus, evidence of any bad faith or malice toward Salomon by them, including their personal desire to become general agents for Crown, cannot be imputed to Crown unless the existence of some wrongful act done by Crown for the purpose of injuring Salomon is demonstrated. Missouri law provides that employees whose contracts are terminable at will have the right to terminate their employment for the purpose of competing with their employer. Additionally, they are allowed to plan and prepare for this competitive enterprise prior to their termination without revealing their plans to the employer. See Thau-Nolde, Inc. v. Krause Dental Supply and Gold Co., 518 S.W.2d 5, 9-10 (Mo.1974); National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 26 (Mo.1966). See generally Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., 531 F.2d 910 (8th Cir. 1976); Metal Lubricants Co. v. Engineered Lubricants Co., 411 F.2d 426, 428-30 (8th Cir. 1969); Motorola, Inc. v. Fairchild Camera and Instrument Corp., 366 F.Supp. 1173, 1180-81 (D.Ariz.1973). Likewise, an employer may offer employment to such applicants if legal and proper means are used in acquiring their services. National Rejectors, supra, 409 S.W.2d at 34.
 
 
 41
 In Metal Lubricants Co. v. Engineered Lubricants Co., supra, 411 F.2d at 429, this court observed:
 
 
 42
 As noted by the Missouri Supreme Court, we are dealing with two conflicting public policies. One policy seeks to protect a business from unfair competition. The other policy favors free competition in the economic sphere. The court explained:
 
 
 43
 " 'It is necessary that there be a balancing of the equities between these two rights, for if the former is carried to its extreme it will deprive a man of his right to earn a living; while conversely, the latter right if unchecked, would probably make a mockery of the fiduciary concept, with its concomitants of loyalty and fair play.' Comment, The Obligation of a High-Level Employee to his Former Employer; The Standard Brands Case, 29 University of Chicago Law Review 339, 351-352. See Wexler v. Greenberg, 399 Pa. 569, 160 A.2d 430. In that case the court stated (160 A.2d 435): 'Were we to measure the sentiment of the law by both English and American decisions in order to determine whether it favors protecting a businessman from certain forms of competition or protecting an individual in his unrestricted pursuit of a livelihood, the balance would heavily favor the latter.' " 409 S.W.2d at 39.
 
 
 44
 In this case, it is clear that Klostermeyer took the lead in attempting to create a new Crown general agency in St. Louis following the July termination of the joint venture. It is uncontroverted that Klostermeyer was responsible for recruiting Blair and Bradley and convincing them to join with him in the effort to obtain an agency contract. None of these acts by the three brokers constitute actionable wrongs. The only acts of relevance here are those of Crown. In this action the Salomon plaintiffs had the burden of proving something more than the fact that Klostermeyer, Blair and Bradley wanted to further their own post-joint venture economic livelihood by securing a general agency contract from Crown. It was incumbent upon the plaintiffs below to prove that Crown "maliciously or without justifiable cause" induced the breach of the relationship between Salomon and his three brokers. Under applicable Missouri law, "(t)he term 'maliciously' in this connection alludes to malice in its technical legal sense, that is, the intentional doing of a harmful act without justification or excuse." Downey v. United Weather Proofing, supra, 253 S.W.2d at 980. Accord, Gerstner Electric, Inc. v. American Insurance Co., 520 F.2d 790, 794 (8th Cir. 1975); Cady v. Hartford Accident and Indemnity Co., 439 S.W.2d 483, 485 (Mo.1969).
 
 
 45
 We have found no evidence of malice on the part of Crown toward Salomon in this record. Nor have we been able to discern the existence of a conspiracy involving Crown for the purpose of wronging Salomon by attempting to subvert Salomon's brokers. The district court's findings to the contrary are clearly erroneous.
 
 
 46
 Specifically, the district court found that the conspiracy was furthered by the May 1972 visit to St. Louis by Crown officer David Williams. 399 F.Supp. at 96. This is the only finding of fact by the district court that charges Crown with private negotiations with the alleged conspirators preceding the disputed July 1 termination of the joint venture. However, the district court's basis for presuming a conspiratorial motive in this visit is unclear. The only evidence of the May visit to St. Louis by Williams is Williams' own deposition in which he states that he visited the agency as part of his routine duties as senior vice president for United States agencies.
 
 
 47
 Nevertheless, the district court's fact finding on this St. Louis visit by Williams indicates that it was the product of Bradley's "Trojan Horse" role.[3] We find no evidence to support this conclusion. It appears that Williams' May 1972 visit was not known to Sidney Salomon, Jr. We do not discern conspiratorial inferences from this fact. Williams openly visited with the brokers at the joint venture's offices at ICI headquarters. Salomon's lack of knowledge could very well be attributed to his infrequent contact with those offices and with the brokers during the time in question.[4]
 
 
 48
 One product of the May visit by Williams was an invitation that Klostermeyer received to visit the Crown home offices in Toronto. There is no evidence that this invitation was offered to Klostermeyer as part of any conspiracy. It was a restatement of an offer to visit the home offices which had been made to a number of Crown brokers in St. Louis the previous fall by W. N. Bowden, a Crown officer who had visited at that time. Brokers Pierce Liberman and Rod Susman had gone to Toronto pursuant to that invitation a few months prior to Klostermeyer's visit. Thus we find no basis for the district court's finding of a conspiratorial intent or a wrongful purpose in David Williams' May 1972 visit to St. Louis.
 
 
 49
 In addition, the district court found that Clarke Lloyd, an officer of Crown who was senior vice president for the United States agencies at that time, "made a determination to terminate the business relations" that had existed between Salomon and Crown as of July 6, 1972. 399 F.Supp. at 96. As a consequence of this finding, Lloyd's July 24, 1972, meeting with Salomon in St. Louis at which Salomon's future role with Crown was discussed would necessarily be interpreted as a sham and a coverup of the conspiracy. The only credible evidence in the record on this specific factual finding is the testimony of Clarke Lloyd in which he indicates that he was informed by Williams on July 6 via a long distance telephone call that the joint venture in St. Louis had been terminated. The court's statement regarding Lloyd's decision to terminate the joint venture general agency on that date wholly disregards this testimony and places an entirely different emphasis on the facts that exist in the record.
 
 
 50
 According to the evidence in the record on this point, the sole "determination" made by Clarke Lloyd on July 6 was that the joint venture had in effect resigned its general agency, "a determination" which prompted the conversation with Klostermeyer and the meeting with Salomon on July 24 at which possible new corporate formats were discussed. Mr. Lloyd's testimony at trial was that the decision to terminate the joint venture general agency was not made until after that meeting. The court's attribution to Lloyd of a decision to terminate Salomon as of July 6 suggests motives on Crown's part which are unsupported by the factual record.
 
 
 51
 Although we have found no evidence of a conspiracy between Crown and the brokers to wrong Salomon, there is evidence in this record suggesting contact between Crown and Klostermeyer, Blair and Bradley during the period following the July 24 meeting with Salomon in St. Louis and the August 9 termination letter. The substance of these contacts appears to have been related to the inclusion or non-inclusion of Sidney Salomon, Jr. in the proposed new general agency for St. Louis. In addition, there is a suggestion in the record, based on inter-Crown memoranda, that limited discussions with Klostermeyer took place shortly after the Klostermeyer visit to Toronto in early July. Finally, Clarke Lloyd testified that he spoke on the telephone with Klostermeyer three or four times and with Bradley two or three times in the weeks between July 7 and August 9, 1972. It is our view that these contacts were part of an overall course of conduct by Crown during this period that was justifiable as an effort to protect its valid economic interests in maintaining a viable insurance agency in St. Louis.
 
 
 52
 Our examination of the record convinces us that the Salomon appellees failed to establish an absence of justification as required under the Harber formulation. Harber, supra, 390 F.Supp. at 683. See also Gerstner Electric, Inc. v. American Insurance Co., 520 F.2d 790, 794 (8th Cir. 1975); Harber, supra, 512 F.2d at 175-76; Cady v. Hartford Accident and Indemnity Co., 439 S.W.2d 483, 485 (Mo.1969). See generally Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc., 531 F.2d 910 (8th Cir. 1976). Justification for intentional interference such as is alleged in this case can be provided through proof that the efforts were undertaken to protect a valid economic interest. Leo Speer Const. Co. v. Fidelity and Casualty Co., 446 F.2d 439, 445 (2d Cir. 1971); Zoby v. American Fidelity Co., 242 F.2d 76, 79-80 (4th Cir. 1957). See also Johnson v. McKee Baking Co., 398 F.Supp. 201, 207 (W.D.Va.1975).
 
 
 53
 The Restatement of Torts states that liability for purposeful interference with business relations will arise unless a privilege to so act is shown. Of special relevance to the case before us is the following language from that Restatement section:
 
 
 54
 The issue in each case is whether the actor's conduct is justifiable under the circumstances; whether, upon a consideration of the relative significance of the factors involved, his conduct should be permitted despite its expected effect of harm to another.
 
 
 55
 Comment a, Restatement of Torts § 767. This section was endorsed by the Missouri Supreme Court in Downey v. United Weather Proofing, Inc., 253 S.W.2d 976, 982 (Mo.1953). Applying these legal principles to the facts in the instant case convinces us that the district court's finding of a lack of justification for Crown's action was clearly erroneous.
 
 
 56
 On July 5, 1972, Crown officer David Williams was informed that its primary general agent in St. Louis, the joint venture between Salomon Associates and ICI doing business as Sidney Salomon, Jr. Life Assurance Agency, had in the words of one witness "resigned their contract." Crown had no reason to doubt the veracity of this information. It came from Robert Klostermeyer, the business manager of the joint venture and a long-time Crown broker who had announced to Williams that "the joint venture had broken up, had been dissolved" and that he was "out of a job." Further, Klostermeyer's source for this information was Lee Kling, president of ICI, the managing partner of the joint venture. Thus, as of July 5 Crown had discovered somewhat indirectly yet from credible sources that the joint venture acting as general agent in St. Louis had been terminated without its knowledge.
 
 
 57
 Crown's Williams received collateral substantiation of this development the next day in a phone call from Ruth Hall, secretary to Sidney Salomon, Jr. for a period of 27 years and a long-time acquaintance of many of the Crown officials. While the specific details of this conversation are in dispute, it is clear that Miss Hall informed Williams that both Salomon Associates and ICI were requesting general agency contracts from Crown. Given these facts, Crown's subsequent actions constituted in our view a rational response to an unexpected occurrence. Faced with the resignation of a major general agent in an important urban area, Crown reacted by discussing with Klostermeyer, who had been known to Crown over a number of years, whether he would be interested in any future general agency arrangement in St. Louis. Following this initial contact, it was Klostermeyer, not Crown, who contacted Blair and Bradley for the purpose of enlisting their support. These facts demonstrate that as of July 5, 1972, Crown was operating under the reasonable assumption that the general agency contract with the joint venture was no longer valid and that Klostermeyer, Blair and Bradley were, in effect, free agents.
 
 
 58
 At the time when this first information relating to the breakup of the joint venture was relayed to Crown by Klostermeyer, the undisputed evidence reveals that Sidney Salomon, Jr. was in Miami, Florida, attending the Democratic National Convention as a delegate. On July 6, Clarke Lloyd attempted to reach Salomon at his hotel in Miami but was unsuccessful. As the result of a July 14, 1972, phone conversation between Clarke Lloyd and Ruth Hall, the meeting with Salomon in St. Louis was arranged for July 24, 1972.
 
 
 59
 Lloyd came to St. Louis for the July 24 meeting without preconceived notions as to what if any future Sidney Salomon, Jr. would have with Crown. The testimony of Lloyd and the deposition of David Williams indicate that Crown felt that the joint venture general agency contract was no longer valid. Inter-office memoranda circulated prior to the July 24 meeting indicate that Crown officials were considering a Salomon role in the formation of a new general agency to supplant the joint venture. These alternatives were discussed with Salomon on July 24. The result of these discussions was a list of demands by Salomon upon which his future relations with Crown would be conditioned. In effect, the proposed new agency would have Salomon as president receiving 25% of the profits plus all renewal commissions and collection fees on business written by the agencies with which he had been associated up to that time. Commenting on these demands, Lloyd stated that he, along with a number of other Crown officials, felt that "Crown Life cannot sanction the arrangement as required by S. Salomon." The tenor of this August 9 memorandum clearly indicates that Lloyd went into the July 24 meeting in good faith for the purpose of resolving the situation that existed between Salomon and Crown Life as a result of the termination of the joint venture. While it is clear that Crown envisioned a new general agency, possibly involving Klostermeyer, Blair and Bradley, it is also clear that they anticipated a continuing role for Sidney Salomon, Jr. Salomon's demands made such a future relationship unworkable. But it was only after the July 24 meeting that Crown finally determined to appoint a new general agency in St. Louis that did not include the participation of Sidney Salomon, Jr.
 
 
 60
 We conclude that the district court was in error in finding that the facts of this case showed a lack of justification for Crown's actions. Further, we find no evidence of malice toward Salomon on this record. Instead, the facts reflect that Crown was motivated by a desire to protect its valid economic interests in the St. Louis market. It had reasonably concluded based upon the facts presented to it that the joint venture had resigned and that Klostermeyer, Blair and Bradley were not committed to Sidney Salomon, Jr. in any contractual or fiduciary sense. Even if it is assumed for the sake of argument that there is evidence to support the district court's findings that the other elements of the Harber test were satisfied, the factual record in this case as developed by the Salomon appellees does not show an absence of justification for the actions taken by Crown.[5]
 
 
 61
 In summary, after extensive analysis of the entire record before the district court and with full realization that it is our duty on appeal to give great deference to the factual findings of the trial court, we conclude that no cause of action for tortious interference with contractual or business relations under Missouri law was established in the instant case. In reaching its decision to the contrary, the district court placed great reliance upon this court's decision in Falstaff Brewing Corp. v. Iowa Fruit & Produce Co., 112 F.2d 101 (8th Cir. 1940). Such reliance was misplaced. In Falstaff the court found that the defendant brewer had wrongfully breached a non-cancellable distributorship contract which it held with the plaintiff and had established a rival beer distributorship run by three men who had formerly comprised plaintiff's entire sales staff. Id. at 107-08. Two actionable wrongs were found to have been committed by the defendant in Falstaff: the procuring of the breach of contract through conspiratorial means and the hiring of the plaintiff's employees in an attempt to ruin its business. It is the existence of these wrongful acts that completely distinguishes Falstaff from the instant case. In this record we have been able to find no wrongful act committed by Crown. See Morton Buildings of Nebraska, Inc., supra, 531 F.2d at 914-16. The district court conceded that the termination of the general agency contract was valid. Even if we assume a contractual or employment relationship between Salomon and the three brokers following the July 1 termination of the joint venture, Missouri law gave them the right to plan a competing enterprise while still under contract. The facts as they appeared to Crown during July and August of 1972 afforded it the privilege to negotiate with Klostermeyer, Blair and Bradley with a view toward a possible general agency contract in order to protect its economic interests in the St. Louis market. The evidence in this case reveals that both sides were guilty of inadequate communication, misunderstanding, and a lack of complete candor with each other. However, the record does not indicate the bad faith, malice, and wrongful conduct that is necessary to establish a cause of action for tortious interference with business or contractual relations.
 
 IV.
 
 62
 Two other issues were raised on this appeal which deserve only passing reference. Intervenor Portnoy-Tessler & Associates, Inc. brought a claim for tortious interference with contractual relations against Crown based upon the fact that its general agency contract with Crown was cancelled as a result of the same acts which led to the cancellation of the joint venture's general agency contract. The district court found that "plaintiff-intervenor has shown no damage arising out of the cause of action of plaintiffs Salomon against defendant Crown." As a result, relief was denied. We affirm that denial.
 
 
 63
 Further, appellants sought from the joint venture the return of certain business records which were said to relate to their life insurance business and which were properly returnable to them under the terms of the cancelled general agency contract. The district court found from the evidence adduced at trial that Crown had the records that it sought available to it within its own computer system and that those records were "easily obtainable through electronic data retrieval methods." This fact, coupled with the court's finding that Crown had "unclean hands," resulted in a denial of relief on that basis. We are convinced from our examination of the record that the district court's finding of Crown's unclean hands is clearly erroneous. In addition, the fact that Crown may have the sought-after records within its computer banks is irrelevant. The general agency contract between Crown and the joint venture which the district court found to be validly terminated provided as follows:
 
 
 64
 All records, letters or other documents relating to the business to be transacted under this Agreement shall be open to inspection by the Company at any time, and, at the termination of this Agreement, shall be turned over to the Company together with any other of the Company's property then in the General Agent's possession.
 
 
 65
 In view of this language and the district court's finding that the termination of the contract was valid, we find no basis for the denial of these records to Crown.
 
 
 66
 We hereby reverse the judgment entered against Crown that is before us in 75-1537 and remand the case for entry of judgment in favor of Crown on the Salomon appellees' claim of tortious interference. Further, we reverse the district court's determination in 75-1538 with regard to the records sought by Crown from the joint venture. We affirm the district court's judgment in 75-1544.
 
 
 
 [1]
 The Honorable H. Kenneth Wangelin, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 The trial court indicated that the deposition testimony was clearly admissible in the lawsuit against the joint venture and reserved ruling as to its admissibility against Salomon Associates
 
 
 [3]
 The district court found that W. Andrew Bradley was a "Trojan Horse" sent into the Salomon camp by Crown for the purpose of subverting the general agency relationship. This finding is clearly erroneous. Salomon testified that he requested of Crown executives the recommendation of a qualified individual "who could be a cashier, but could be trained to help with agency work and administrative work and to relieve the agency of that responsibility." Thereafter upon the recommendation of a Crown official, Salomon negotiated with and obtained the services of Bradley who began working for Salomon Associates in late 1970. Bradley had had experience in the office management and the administration of insurance business. Just prior to his employment by Salomon Associates Bradley was employed by Crown in one of its Toronto branches. There is absolutely no evidence to support the contention that Bradley was acting in concert with Crown against Salomon's interests. None of the evidence suggests any "Trojan Horse" role for Bradley, nor have we been able to discern any "camouflaged actions" by him. The reference to Bradley as an "insider" relates to the fact that he was in an office administration position within the agency as opposed to being a producer of insurance business. He served as cashier for the joint venture until its termination. After a short term as secretary-treasurer of the new agency he sold his stock and assumed the duties of cashier
 
 
 [4]
 Sidney Salomon, Jr. testified that he maintained an office at the ICI building but that he spent little time there. He felt that his Arena offices "had a little more glamor." Klostermeyer testified that he saw Salomon a total of three or four times during the year of the joint venture
 
 
 [5]
 In view of our finding that no liability was established on the tortious interference claim we do not reach the damage issue in this case. We note, however, that the Salomon appellees had the burden in the district court to prove some damage attributable to the wrong they suffered at the hands of Crown. The district court's finding was that Crown wrongfully subverted and brought about a breach in the relationship between Salomon and the three brokers. Thus, any showing of damage must necessarily arise from the loss occasioned by Crown's acts. However, the actual damage award by the district court relied exclusively upon expert testimony and economic projections which were premised upon the continuation of the general agency contract over a period of 20 years. We find no basis for the use of such a standard. The use of the general agency contract as the basis for the damage award does not square with the district court's finding that the termination of that contract was in fact valid according to its terms. We also find no basis for the use of a 20 year period. It is undisputed that the general agency contract was terminable upon one month notice by either side. Further, ordinary renewal commissions are paid for a period of 10 years. Similarly, we find no basis whatsoever for the district court's award of $750,000 in punitive damages