CITY OF WARRENSBURG, Missouri, and Industrial Development Authority of the City of Warrensburg, Missouri, Plaintiffs,

v.

RCA CORPORATION, CIT Financial Corporation, and All-Steel, Inc., Defendants.

No. 80–0993–CV–W–1.

United States District Court, W.D. Missouri, W.D.

Nov. 10, 1982.

Thomas A. Sweeny, Popham, Conway, Sweeny, Fremont & Bundschu, Kansas City, Mo., for plaintiffs.

Karl F. Schmidt, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for defendants.

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN REGARD TO COUNT I AND ORDERS DIRECTING FURTHER PROCEEDINGS

JOHN W. OLIVER, Senior District Judge.

## I. *Introductory*

This case pends on (1) defendants' motion for summary judgment directed to all three counts of plaintiffs' pending petition, and (2) plaintiffs' motion for leave to file first amended complaint without leave of Court, or, in the alternative, for leave of Court to file first amended complaint.

Defendants' motion for summary judgment will be granted in regard to Count I of plaintiffs' pending petition. For reasons we shall state in detail, orders directing further proceedings will be entered in regard to defendants' motion for summary judgment directed to Counts II and III of plaintiffs' pending petition and plaintiffs' motion for declaration of right to file first amended complaint without leave of Court, or, in the alternative, with leave of Court.

Plaintiff City of Warrensburg, Missouri (Warrensburg) and Industrial Development Authority of the City of Warrensburg, Missouri (IDA) filed their three count petition in the Circuit Court of Johnson County, Missouri against defendants RCA Corporation (RCA), CIT Financial Corporation (CIT) and All-Steel, Inc. (All-Steel) for damages allegedly resulting from plaintiffs' alleged loss of an Urban Development Action Grant (UDA Grant) allegedly awarded to the City of Warrensburg, Missouri by the Department of Housing and Urban Development (HUD). Count I, captioned "Breach of Contract," alleges that defendant All-Steel breached a contract with plaintiffs by not locating a manufacturing plant in Warrensburg Industrial Park and seeks $5,000,000.00 actual damages. Count II of plaintiffs' pending petition, captioned "Malicious Interference," alleges that defendants CIT and RCA caused All-Steel to breach its contract with Warrensburg and IDA and prays for $5,000,000.00 actual damages and $100,000,000.00 punitive damages. Count III of plaintiffs' pending petition, captioned "Negligent Misrepresentation" alleges that defendants All-Steel and CIT negligently misrepresented to plaintiffs that a manufacturing plant would be placed in the Warrensburg Industrial Park and prays for $5,000,000.00 actual damages and $37,000,000.00 punitive damages. The first

18 paragraphs of plaintiffs' pending complaint are alleged to be "common paragraphs" and are subsequently incorporated by reference in each of the separately stated counts.

This case was timely removed to this Court and shortly after removal defendants filed a Rule 12(b)(6) motion to dismiss each of the three counts of plaintiffs' petition. That motion was denied. Defendants filed their pending motion for summary judgment after the parties had completed a schedule of discovery. That schedule was filed in accordance with procedures discussed at a pretrial conference held June 10, 1982.

We are satisfied that the present record establishes that no material facts are in dispute in regard to the legal questions presented by defendants' motion for summary judgment as directed against Count I. After stating the standards applicable to summary judgment motions, we will state the reasons why defendants' summary judgment motion should be granted in regard to Count I. We will then discuss the other counts in plaintiffs' pending petition and thereafter state the reasons why it is necessary that orders be entered directing further proceedings in this case.

## II. *Summary Judgment Standards*

The files and records in this case show that it has long been apparent that a substantial question of law is presented in connection with Count I of plaintiffs' pending petition under which plaintiffs are attempting to recover for an alleged breach of contract. Defendants' December 8, 1980 Rule 12(b)(6) motion to dismiss put that legal question in appropriate focus. This Court's April 8, 1980 order was entered for the purpose of ascertaining whether any of the parties contended that any material facts necessary for the determination of that legal question were in actual dispute.

This Court's effort to process the legal question presented by Count I under procedures agreeable to both sides was unsuccessful. On June 23, 1982, however, the parties agreed on a Rule 26(f) plan and schedule of discovery which included their agreement in regard to a briefing schedule under which defendants' motion for summary judgment would be filed and determined under the applicable Rules of Civil Procedure. Plaintiffs' argument in opposition to defendants' motion for summary judgment and plaintiffs' statement of their views in regard to the standards applicable to ruling motions for summary judgment require a much more detailed statement of those standards than would otherwise be necessary.

Plaintiffs argue that defendants' motion for summary judgment may not be granted because of the presence of "alleged facts about which material issues exist." [Pls.' Suggestions in Opposition, p. 1]. Plaintiffs place principal reliance on *Roberts v. Browning,* 610 F.2d 528 (8th Cir.1979) and quote extensively from the Court of Appeals' application of established summary judgment principles to the factual circumstances of that case [Ibid, p. 3]. Indeed, plaintiffs' argue that *Roberts v. Browning* requires that summary judgment be denied in regard to Count I of plaintiffs' pending petition "even if the Court does not believe we [can] make a submissible case." Plaintiffs' reiterate that argument on page 51 of their suggestions in opposition by suggesting that "if the dictates of *Roberts v. Browning, supra,* are to be observed, defendants' Motion for Summary Judgment ... should be denied, even if the Court believed plaintiffs have an uphill fight on Count I." [1]

■ We agree that *Roberts v. Browning* sets forth the applicable standards that the

---

1. *Roberts v. Browning* reversed the district court's grant of the defendant's motion for summary judgment in a Missouri Service Letter Statute case. Plaintiffs' treatment of that case suggests that plaintiffs apparently believe that summary judgment would never be proper in a Missouri Service Letter Statute case. The

Court of Appeals' recent affirmance of the summary judgment granted to the defendant in *Egloff v. Wilcox Elec. Co.,* 529 F.Supp. 190 (W.D.Mo.1981), see 694 F.2d 1102 (8th Cir. 1982), suggests that plaintiffs' reading of *Roberts v. Browning* is much too broad.

district court must apply in passing on motions for summary judgment. We also agree that those standards "are thoroughly settled in this Circuit and need not be explored in detail; nor do they require detailed citations in support of a statement of them." 610 F.2d at 531. The burden, of course, rests "on the defendant to establish beyond controversy that there [is] no genuine issue as to any material fact and that the defendant [is] entitled to judgment as a matter of law." [*Id.* at 531]. Plaintiffs are entitled "to have the case viewed in the light most favorable to [them] and to have the benefit of all inferences favorable to [them] that might reasonably be drawn from the evidence."

■ *Roberts v. Browning* accurately stated the applicable standards at the outset of that opinion as follows:

Summary judgment is a harsh remedy and should be granted sparingly. On the other hand, courts should not be unreasonably niggardly in its use lest the purpose of the rule, which is to avoid needless trials, be defeated. While a motion for summary judgment ordinarily should not be granted if it appears that the position of the party opposing the motion would be supported at trial by substantial evidence, still it must be kept in mind that "substantial evidence" is more than a "mere scintilla." .... It must be enough to justify a trial judge in denying a directed verdict for the moving party at the conclusion of a jury trial. See *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and cases cited. Conversely, if a district judge to whom a Rule 56 motion is addressed is satisfied that at the conclusion of a jury trial he would be required to direct a verdict in favor of the moving party, then the granting of the motion is appropriate. [610 F.2d at 531–32]

*Roberts v. Browning* directed attention to "the general discussion of Rule 56 that appears, with ample citations, in 10 C. Wright & A. Miller, *Federal Practice & Procedure,* §§ 2711, *et seq.*" [*Id.* at 531]. Section 2714 of that treatise states "once the court deter-

mines that there are no disputed material facts, it is free to enter a judgment on the basis of a determination of the governing legal issues and doing so does not deprive the opposing party of his right to jury trial." Section 2725 directed specific attention to the third sentence of Rule 56(c), which "provides for the immediate rendition of a judgment in the event that the matters considered by the court on a motion for summary judgment disclose 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" The authors then added:

This provision, which is the very heart of the summary judgment procedure, demonstrates that the principal judicial inquiry required by Rule 56 is whether a genuine issue of material fact exists. If no such issue exists, the rule permits the immediate entry of judgment."

The same thought is reiterated later in the same section when the authors state that:

... [T]he inquiry on a motion for summary judgment is whether a "genuine issue as to any material fact" exists. Accordingly, in the event there is a real dispute as to the facts, it initially must be determined whether the facts in issue are material. A dispute as to an immaterial fact does not preclude summary judgment.

And, finally, Section 2727 summarizes the procedures anticipated in connection with a motion for summary judgment. It is there stated that:

It should be noted from the preceding discussion that both the movant and the adversary at a summary judgment hearing generally will make a presentation regarding the existence or non-existence of a factual dispute. The movant will seek to demonstrate that there is no genuine issue as to any material fact; the opposing party will attempt to show the existence of a factual dispute as a basis for the court's denial of the motion. In light of this, it occasionally is said that *the parties on a summary judgment mo-*

*tion must fully disclose what the evidence will be on the alleged issues and that a party may not withhold what he intends to use at trial.* (Emphasis ours)

In our letter to counsel dated April 30, 1982, we directed attention to *Howard v. Russell Stover Candies, Inc.,* 649 F.2d 620 (8th Cir.1981), as a recent example of the Eighth Circuit's affirmance of a motion for partial summary judgment rendered in a contract action. We further directed counsels' attention to *McCormick v. Ross,* 506 F.2d 1205 (8th Cir.1974) as an illustration of the Eighth Circuit's recent but now consistent reliance on Moore's *Federal Practice* in regard to motions for summary judgment. Because of plaintiffs' obvious reluctance in this case to come forward with any and all evidence upon which plaintiffs would rely to establish a triable issue of material fact, we directed attention in that letter to various paragraphs in Moore's *Federal Practice* in order to advise counsel of the principles that this Court would apply in determining defendants' then anticipated motion for partial summary judgment in regard to plaintiffs' Count I claim.

We noted, for example, that ¶ 56.11[3] expressly stated that a party opposing summary judgment "may not hold back his evidence until trial; he must present sufficient materials to show that there is a triable issue." We also quoted ¶ 56.17[28], which deals specifically with defenses of alleged illegality in its entirety. That paragraph states that:

The defense of illegality, like any other defense, may, of course, involve a genuine issue of material fact. When it does, under basic principles, a motion by the claimant for summary judgment must be denied. And, similarly, a motion by the defendant on the basis of illegality will be denied. *On the other hand, if the defense is legally sound and does not involve a triable issue of fact, the defendant is entitled to summary judgment.* (emphasis ours).

We now add that *McCormick v. Ross* also cited 6 Moore's Fed.Prac. ¶ 56.22[1] with approval. In that paragraph, Professor Moore focused attention on that portion of Rule 56(e), added in 1963, which provides that:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. [6 Moore's Fed.Prac. 56–1303]

*Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107 (5 Cir.1979) recently applied Rule 56(e) in affirming the grant of a defendant's motion for summary judgment in an antitrust case. That court noted that "the facile notion pressed upon us that antitrust cases are typically unsuited for summary procedures can be traced to *obiter dictum* in *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)." It concluded, however, that "there is nothing in Rule 56 itself or in the other Rules or in the Advisory Committee Notes to suggest that Rule 56 does not apply equally to all actions. See Federal Practice and Procedure ¶¶ 56.17[1], .17[5], Wright and Miller, Federal Practice and Procedure §§ 2730, 2732." That court added "[T]hat the Summary Judgment Rule applies to antitrust cases is readily evident from the Supreme Court's later treatment of *First National Bank of Arizona v. Cities Service,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) in which a writ of *certiorari* was granted to determine whether the summary judgment entered was consistent with the standards announced in *Poller.*" [603 F.2d at 1111]

*Aladdin Oil Co.* then noted that in *Cities Service* "the Supreme Court concluded that the defendant had properly supported its motion for summary judgment, and plaintiff, in effect, had merely rested on the allegations of conspiracy contained in the complaint." The court quoted the following from the Supreme Court's decision in *Cities Service:*

To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. [*Id.*]

■ We are satisfied that under the record developed under the agreed discovery schedule and under other procedures followed in this case that there are not any material facts in dispute in regard to the legal question presented by Count I of plaintiffs' pending petition. We will therefore rule defendants' motion for summary judgment directed to Count I.

■ We are further satisfied that in spite of this Court's efforts to require plaintiffs to "set forth specific facts showing that there is a genuine issue for trial" in regard to plaintiffs' claims, as expressly required by Rule 56(e), plaintiffs, except in regard to Count I, have thus far refused to do so in regard to any of their remaining claims. We will defer ruling all pending motions other than defendants' motion for summary judgment directed to Count I in order to afford plaintiffs one final opportunity to comply with the requirements of Rule 56 generally, and with the requirements of Rule 56(e) in particular.

Plaintiffs are presently advised that if they do not make appropriate response to the orders we shall enter directing further proceedings in regard to plaintiffs' remaining claims, that summary judgment, if appropriate, will be entered against them in regard to all their remaining claims in accordance with Rule 56(e).

**2.** Judge John F. Philips, later a distinguished judge of this Court, stated, as a judge of the Kansas City Court of Appeals, in *Crutchfield v. Warrensburg,* 30 Mo.App. 456, 462 (K.C.Ct. App.1888) that "this statute was first enacted in 1874. Laws of Mo. 1874, p. 44. The history of the times which evoked this legislation can leave no doubt in the mind of one familiar with it, that the controlling purpose inspiring the legislature was to cut off absolutely, among other things, just such claims as the one under

### III. *Discussion of Count I*

Count I of plaintiffs' pending petition prays for a judgment of $5,000,000 for an alleged "breach of contract." Paragraph 1 of Count I merely incorporates the first 18 "common paragraphs" of plaintiffs' pending complaint. Plaintiffs then allege that:

2. A contract existed between plaintiffs and All-Steel whereby All-Steel promised to lease a manufacturing facility in City's Industrial Park from IDA and All-Steel agreed with City to partially finance the erection of the facility through a UDA Grant and City promised to make certain improvements to the Industrial Park needed by All-Steel. City and IDA carried out their agreements and commitments until All-Steel breached the contract by stating on May 9, 1980 that it was not going to perform its obligations, which breach of contract resulted in damages to plaintiffs in the amount of $5,000,000.00.

Both sides recognize that Section 432.070 V.A.M.S. is applicable to this case. That section provides that:

No county, city, town, village, school township, school district or other municipal corporation shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law, nor unless such contract be made upon a consideration wholly to be performed or executed subsequent to the making of the contract; and such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing.[2]

consideration.... In *Woolfolk v. Randolph County,* 83 Mo. 501, the court says: 'The manifest purpose of the requirement is, that the terms of the contract shall, in no essential particular, be left in doubt, or to be determined at some future time, but shall be fixed when the contract is entered into. This was one of the precautions taken to prevent extravagant demands, and to restrain officials from heedless and inconsiderate engagements.' "

■ Defendants' primary argument in support of its summary judgment motion directed to Count I is not complicated. Defendants argue that plaintiffs cannot establish, under the undisputed material facts, that any contract can be said to be in existence that complies with the provisions of Section 432.070. Defendants set forth the specific material facts upon which their motion directed to Count I is based on page 13 of their suggestions in support of their pending motion for summary judgment. Those facts are:

1. There is no writing or document that sets forth the consideration and the provisions of the alleged contract between plaintiffs and All-Steel, that is dated when made and that is subscribed by both plaintiffs and All-Steel, or their agents.

2. Prior to May 8, 1980 there was only one document from All-Steel addressed to an official of the City of Warrensburg and that document is the November 28, 1979 letter from Robert Strawbridge to Delores Hudson.

Plaintiffs state on page 28 of their suggestions in opposition that "the first assertion is accepted if it is construed to mean that there is no single writing or document that contains the rest of the items set forth in the paragraph." Plaintiffs state that "with regard to the second factual assertion, ... the documents that were addressed to HUD ... set out the obligations that each party would have to the other." Plaintiffs' responses obviously do not "set forth specific facts showing that there is a genuine issue for trial," as required by Rule 56(e) of the Rules of Civil Procedure. Indeed, plaintiffs at long last concede that, on the facts, there simply is no contract "in writing and dated when made ... subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing," as required by Section 432.070.

Plaintiffs' somewhat quibbling responses to the undisputed material facts relied upon by defendants do no more than set the stage for plaintiffs' "substantial compliance" and "no single writing" legal arguments which we will discuss and reject in the next part of this memorandum opinion. We turn now to the cases which set forth the Missouri rules of decision relating to Section 432.070 that are applicable to the undisputed factual situation in this diversity case.

*City of North Kansas City v. Sharp,* 414 F.2d 359, 364 (8th Cir.1969) cites many of the numerous Missouri cases which establish that the provisions of Section 432.070 are mandatory and that all persons are charged with the restrictions imposed by that statute on municipal officials to contract on behalf of their municipality. The Missouri cases cited by Justice, then Judge, Blackmun, as would be expected, support the Court of Appeals' statement of the Missouri rules of decision. *City of North Kansas City* held that:

The Missouri courts, of course, have held these provisions [including Section 432.070] to be mandatory and have also held that contractors are charged with notice of the restrictions imposed on municipal officials to contract on behalf of their municipality.... [citing numerous Missouri cases] Thus the contract, to be valid and not void, must be one "expressly authorized by law," must be within the power of the municipality, must be for a consideration to be performed subsequent to the making of the contract, must be "in writing and dated when made," and must be subscribed by the parties "or their agents authorized by law and duly appointed and authorized in writing," and the city council shall keep "a journal of its proceedings." [414 F.2d at 364]

There are at least two Missouri cases that involved factual circumstances quite close to the undisputed factual circumstances presented in this case. Those cases are *Riley v. City of Rock Port,* 165 S.W.2d 880 (Mo.App.1942) and *Fulton v. City of Lockwood,* 269 S.W.2d 1 (Mo.Sup.1954). *City of Rock Port* involved efforts of a city to obtain a federal PWA grant for the construction of a municipal power plant and, later, a federal grant for the construction of

a municipal ice plant. The plaintiff engineering firm executed a contract with the city which had been authorized by a "resolution adopted by the Board of Aldermen." It was conceded, however, that the contract approved by the city and executed by the parties covered only engineering services for the power plant.

Plaintiff had, however, actually rendered engineering services for the ice plant grant, although the Board of Aldermen never specifically approved a contract covering those services. Plaintiff sued the city for the services he rendered in regard to the ice plant. The trial court rendered judgment for the plaintiff in regard to plaintiff's claim for services rendered in regard to the ice plant and noted that plaintiff had been paid in full for services rendered in regard to the power plant. Judgment was rendered against the city on its counterclaim for money it had expended in partial payment of the fees charged by plaintiff for services rendered in regard to the ice plant.

The Missouri Court of Appeals reversed the judgment for the plaintiff but affirmed the judgment against the city on its counterclaim. Under the facts presented in *City of Rock Port,* it is clear that on March 1, 1937 the city passed a general resolution that related to both the power plant and the ice plant.[3] The federal Public Works Administration, however, split the city's application into two parts, one for the power plant and one for the ice plant. And, as stated, no resolution was ever passed and no formal contract was ever executed in regard to payment for the engineering services rendered in regard to the ice plant, although it was clear that plaintiff had actually rendered such services. The Missouri Court of Appeals stated that "the vital point in this case is whether the above statute applies to the services rendered by the plaintiff concerning the ice plant; he has been paid in full for the services rendered concerning the power plant." [165 S.W.2d at 886]

In ruling that question, *City of Rock Port* noted that:

If there was a resolution passed by the Board of Aldermen on March 1 authorizing the Mayor and Engineering Service Company to furnish whatever information the PWA might require, there is nothing in the record to indicate that any written contract was entered into by the city with the plaintiff for such services or of what such services should consist or the remuneration therefor. If the Mayor made any oral request or arrangement with the plaintiff to supply him or the PWA with such information, such would not bind the city. [Id. at 888]

In reversing the judgment rendered by the trial court in plaintiff's favor, the Missouri Court of Appeals concluded that:

There can be no recovery in the absence of a contract, and if there be a contract, there can be no recovery unless that contract is of such a nature as to comply with the terms of the statute.

We have no hesitancy in holding that the services rendered by the plaintiff concerning the ice plant, which, if carried out by the city, would involve the expenditure of more than $30,000 of city funds, are such services as clearly come within the above statute, and before the plaintiff can recover therefor, such services must be authorized by the Board of Aldermen and evidenced by written contract complying with said statute. [Id. at 887]

*Fulton v. City of Lockwood* also involved a Missouri city's effort to obtain a federal

**3.** The March 1, 1937 resolution provided:
Be it resolved by the Board of Aldermen of City of Rock Port, Mo.
Section I. That J.E. Welch, Mayor, be and he is authorized to execute and file an application on behalf of City of Rock Port, Mo., to the United States of America for a grant to aid in financing the construction of municipal power and ice plant.

Section II. That Mayor J.E. Welch, mayor, be and is hereby authorized and directed to furnish such information as United States of America through the Federal Emergency Administration of Public Works may reasonably request in connection with the application which is herein authorized to be filed.

grant; the federal grant sought in that case was from the Federal Works Agency for the construction of a sanitary sewage system. The Supreme Court of Missouri noted that "plaintiff claimed he was entitled under a contract to $8,800 for engineering services to the city; that $2,500 of said $8,800 had been received; that he had been dismissed without cause by defendant before the project was undertaken, and asked judgment for the balance of his fee, to wit: $6,380." [269 S.W.2d at 3] The defendant city, on the other hand, "claimed the execution of the contract had never been lawfully authorized by the city, and in a counterclaim sought the recovery of the $2,500." [Id.]

The Supreme Court of Missouri recited the facts by stating that "the mayor, on August 2, 1945, wrote plaintiff, a registered and licensed consulting engineer of St. Louis County, Missouri, stating he would be glad to hear from him if interested in a sanitary sewerage system the city was thinking of constructing." [Id.] The plaintiff responded to that letter under date of August 8, 1945 by a letter in which he enclosed copies of an application for a federal grant, copies of an engineering contract, a copy of the federal statute authorizing the grant, and a statement "that thereunder cities might receive a 'grant of cash from the Federal Works Agency' for the preparation of plans for municipal projects, but that 'so far no funds' were available for construction." [Id. at 3–4]

The engineering contract enclosed in plaintiffs' letter to the mayor recited that execution of the contract had been approved by the city at a meeting of the mayor and board of aldermen on February 27, 1946. The Supreme Court of Missouri, however, noted that "a search of the journal of the board of aldermen by plaintiff and defendant revealed no minutes of any meeting of the board on February 27, 1946, or any authority for the execution of the contract with plaintiff on behalf of the city." [Id. at 4] In affirming the judgment of the trial court in favor of the defendant city, the Supreme Court of Missouri held:

It has been considered sufficient but necessary under § 432.070, *supra*, that the authority to execute contracts on behalf of a city "be entered of record upon the minutes of the board of aldermen." . . . [Citing many Missouri cases] Where, as in the instant case, no record was kept authorizing anyone on behalf of the city to enter into the contract, the court stated the contract or order "was void from the beginning." *Eureka Fire Hose Mfg. Co. v. City of Portageville, supra* [106 S.W.2d 513]. [Id. at 5–6] . . . There being no minute or other record in the journal of the board of aldermen authorizing the execution of the contract on behalf of the city, the collateral proceedings in the instant case seeking to establish, over objections interposed, the required statutory written authority for executing the contract by parol or secondary evidence was insufficient under the above authorities. *See also State ex rel. Barkwell v. Trimble,* 309 Mo. 546, 274 S.W. 683, 684[1–3]; *City of Brunswick ex rel. Barkwell v. Scott,* 219 Mo.App. 45, 275 S.W. 994, 995[5, 6]. [269 S.W.2d at 6]

The facts in *City of Lockwood* showed that on May 6, 1946 the city did, by the passage of an appropriate resolution, authorize the mayor to make an application for a $2,500 grant from the federal government for the purpose of providing funds for the preparation of plans and specifications for the sanitary sewage system and that thereafter "the city received the $2,500 in two installments and paid this money to plaintiff." The trial court granted judgment for the city on its counterclaim against the plaintiff for $2,500 paid out under a contract which had not properly complied with the requirements of Section 432.070. The Supreme Court of Missouri affirmed that judgment on the city's counterclaim, holding that:

The funds were public funds. Public officials discharging duties with respect thereto are not dealing with their own. All persons are charged with knowledge of the laws enacted for the protection of public property and are required to take

notice thereof. Public officials act in regard to public funds in a trust capacity as servants of the public. Their acts beyond the scope of their authority are, and are known to be, unauthorized, do not bind their principal, and their mistakes are their own, and not the mistakes of their sovereign. The protection of the public and the declared public policy requires public officials to comply with mandatory statutory provisions, and such requirements may not be avoided by a compliance only when the official sees fit to comply. [*Id.* at 7–8] . . . Under the instant record the execution of a contract by the mayor and city clerk with plaintiff was never authorized by the board of aldermen. . . . *Riley v. City of Rock Port,* Mo.App., 165 S.W.2d 880, 889[12–15], the only case involving public funds cited by plaintiff, does not establish error.[4] [*Id.* at 8]

For reasons that have never been explained, plaintiffs state in their suggestions in opposition to defendant's motion for summary judgment as directed against Count I, that it is "obvious, or at the very least, a principal inference, that All-Steel representatives considered themselves legally obligated, and not just morally obligated, to go forward with the project" (P. 25). There is, of course, some deposition testimony to support the idea that several All-Steel officials were extremely disappointed by RCA's refusal to permit CIT and All-Steel to go any further with the Warrensburg project. Several of those All-Steel officials did express a feeling of some sort of a moral obligation to the City of Warrensburg (*see,* e.g., Strawbridge deposition, at 68–71 and French deposition, at 195–96, 199, 205).

It must be noted, however, that plaintiffs make no real effort to recover the expenses which the City of Warrensburg may have disbursed in their unsuccessful effort to obtain the HUD grant. Neither side cites the line of Missouri cases, some of which are cited in the last footnote, in which a municipality, even though it had failed to comply with Section 432.070, nevertheless brings an action against defendants who caused the municipality to incur what obviously were illegal expenses.

Most of the cases cited by the parties, on their facts, involved actions against, rather than by, the municipality. Cases in which the municipality was a plaintiff are illustrated by *Bride v. City of Slater,* 263 S.W.2d 22 (Mo.Sup.Ct.1953); *City of St. Francois v. Brookshire,* 302 S.W.2d 1 (Sup. Ct.Mo.1957); *Grand River Tp., De Kalb County v. Cooke Sales & Serv.,* 267 S.W.2d 322 (Sup.Ct.Mo.1954); and *City-Wide Asphalt Co. v. City of Independence,* 546 S.W.2d 493 (Mo.App.1977), (involving a counter-claim by the City of Independence).

All of those cases cite and make reference to the Annotation entitled "Right of Municipality or other public body, or tax payer, to recover back payments made under invalid or unenforceable contract," reported in 140 A.L.R. 583. That Annotation, and many of the cases cited therein, as do the Missouri cases, contain language discussing the "comparative equities" of the parties, which suggests that plaintiffs may have some sort of equitable cause of action to recover their out-of-pocket expenses which plaintiffs have thus far failed to assert in any form.

Certainly, no such claim is made in Count I of plaintiffs' pending petition. Defendants' motion for summary judgment directed to that count will be granted for the reasons we have stated in regard to Section 432.070.

■ We need not and therefore do not discuss in any detail defendants' secondary argument in support of their summary

---

4. After holding, as noted in the quotation above, that *City of Rock Port* did not require reversal of the judgment in favor of the city on its counterclaim, the Supreme Court of Missouri stated that the following cases supported the affirmance of the counterclaim against the plaintiff: *Lamar Township v. City of Lamar,* 261 Mo. 171, 187 et seq., 169 S.W. 12, 15, 16; *State v. Weatherby,* 344 Mo. 848, 129 S.W.2d 887, 890[2–10]; *Coleman v. Kansas City,* 348 Mo. 916, 156 S.W.2d 644, 649[12, 15]; *Kansas City v. Halvorson,* 352 Mo. 280, 177 S.W.2d 495, 497[2]. [Id. at 8].

judgment motion directed to Count I other than to state that plaintiffs' response to that argument does not set forth specific facts which show that there are any genuine issues for trial in that regard. Defendants' Count I secondary argument is based on the principle that, even in the absence of Section 432.070, plaintiffs can not maintain an action for breach of contract for the reason no contract ever came into being in that there was no offer, and no acceptance under the undisputed factual circumstances. Defendants rely upon the fact that "every writing from All-Steel, including the November 28, 1979 letter, that was not merely exchanged among defendants and that concerned the terms and conditions being negotiated for the proposed plant, contains language that expressly provides either that the document itself is not to be construed as an offer by All-Steel or that All-Steel will not be legally bound in any way other than by the execution of formal legal documents."

Plaintiffs do not attempt to put those facts in issue. Rather, plaintiffs, without reference to any factual data in the record, attempt to describe the November 28, 1979 letter as "All-Steel's original *commitment* letter" (Pls.' suggestions in opposition, p. 10); the January 14, 1980 letter as All-Steel's "subsequent *commitment* letter" (Ibid, p. 12); and the January 31, 1980 corporate resolutions passed by All-Steel and CIT as "gold-plated" *commitments* (Ibid, pp. 20–21). Plaintiffs also present an involved and inaccurate description of the legal significance and requirements of the HUD procedures and the various documents filed with HUD in connection with Warrensburg's effort to obtain a UDA grant (Ibid, p. 35 *et ff.*).

We find and conclude that plaintiffs' effort to meet defendants' Count I secondary argument is without merit for the reason that all of the documents to which plaintiffs make reference speak for themselves and their legal effect may not be modified by the descriptions which plaintiffs seek to place on those documents. We further find and conclude that, even in the absence of Section 432.070, plaintiffs cannot maintain

an action for breach of contract for the reason that under the undisputed material facts and established principles of contract law, no contract ever came into being under which the parties agreed to be legally bound.

We turn now to the reasons why plaintiffs' legal arguments in regard to Count I must be rejected.

### IV. *Rejection of Plaintiffs' Count I Arguments*

Plaintiffs' suggestions in opposition purport to recognize that defendants' primary argument in regard to Count I "is that as a matter of law no contract exists between All-Steel and the plaintiffs" (Plaintiffs' suggestions in opposition, p. 31), and that Section 432.070, V.A.M.S., prohibits any recovery for an alleged breach of contract. Plaintiffs' suggestions, however, make no substantial effort to answer that argument. Rather, plaintiffs suggest that "[d]efendants' obvious error is the belief that there must be a single document," and argue that "Missouri courts have had cases in which the authorized actions of the city were never made the part of one formal contract" (Id., p. 31).

Plaintiffs attempt to rely solely on language quoted from *Hoevelman v. Reorganized School District R2 of Crawford County,* 452 S.W.2d 298 (Mo.App.1970) and from *Burger v. City of Springfield,* 323 S.W.2d 777 (Mo.App.1959) to support their argument.

The dictum quoted by plaintiffs from *Hoevelman* does not support plaintiffs' argument. Indeed, the actual holding of that case supports defendants' argument in support of its motion for summary judgment in regard to Count I. For it is clear that the judgment in plaintiff's favor in *Hoevelman* was reversed outright by the Springfield Court of Appeals. The actual holding of that case was that "the procedures undertaken to gain the services of plaintiff as a bus driver were not in substantial compliance with the statutes and could not attain for plaintiff a contract legally enforceable against the defendant school district for the

full nine-month period involved." *Hoevelman* further held that:

> The requirements of § 432.070 ... that contracts with school districts must be in writing and subscribed by the parties thereto is mandatory and not merely directory. [citing many Missouri cases].

Our finding and conclusion that defendants' Count I motion for summary judgment should be granted is not based on any notion that "substantial compliance" with Section 432.070 may not, under appropriate factual circumstances, be established under applicable Missouri law. Nor is our determination based on any notion that applicable Missouri law requires that a particular contract must be set forth in a single document in order to meet the requirements of Section 432.070.

*Lynch v. Webb City School District,* quoted in the *Hoevelman* dictum, affirmed a summary judgment in favor of a school teacher against the school district under facts which established that the plaintiff's name was included on the list of teachers made a part of the official minutes of a meeting of the school board. A standard form of contract was delivered to the plaintiff in accordance with official board action. Plaintiff signed and returned that contract. The court held that such action constituted "a substantial compliance with Section 432.-070 under principles stated in *State ex inf. McKittrick v. Whittle,* 333 Mo. 705, 63 S.W.2d 100 (1933)."

*Lynch* also noted that numerous Missouri cases, including *Edwards v. School Dist. No. 73 of Christian County,* 221 Mo.App. 47, 297 S.W. 1001 (1927) had held that a teacher's contract need not be "in a single document bearing the signatures of the teacher and the president of the board and the attestation of the secretary of the board." *Edwards,* relied upon in *Lynch,* relied upon the much earlier case of *Blades v. Hawkins,* 133 Mo.App. 328, 112 S.W. 979 (1908) to support its holding that present Section 432.070 does not require "that a teacher contract be in any particular form, nor does [that] section require that the parties to be bound all sign the same instrument."

*Blades,* in its turn, relied upon the leading Missouri case of *Aurora Water Co. v. City of Aurora,* 129 Mo. 540, 31 S.W. 946 (1895) to support its finding and conclusion that "when the county court of Stone county entered of record its order for the employment of Crawford for work wholly to be performed in the future, setting forth the details of the employment and the compensation to be paid, and Crawford filed his written acceptance of the employment, we think, under the above authorities, the contract was complete as far as the mode of its execution is concerned."

In *Aurora Water Co.,* the city attempted to escape liability on the theory that present Section 432.070 required the contract with the city to be contained in a single document in accordance with the rule of decision then applicable to cases involving Missouri's general statute of frauds.[5] *Aurora Water Co.* rejected that single document argument by holding that "it is enough to say that the ordinance having been passed as required by law, which ordinance set forth the terms of the contract, and that ordinance being approved by the requisite vote, and then accepted by the person or persons proposing to build the works, constituted a completed contract." [31 S.W. at 955].

**5.** The still earlier Missouri Statute of Frauds case of *Ringer v. Holtzclaw,* 122 Mo. 519, 20 S.W. 800 (1892) contained a statement to the effect that "all the authorities are agreed that the memorandum must state the contract with reasonable certainty, so that its essential terms can be ascertained *from the writing itself,* without a resort to parol evidence." (emphasis ours) [20 S.W. at 801]. *Ringer* was thus thought to have established a rule of decision that the entire contract must be set forth in a single document in order to comply with the Statute of Frauds. *Lamar Water & Elec. Light Co. v. City of Lamar,* 128 Mo. 188, 26 S.W. 1025 (1894), however, made clear that *Ringer* should not be given such a broad reading. *Lamar* held that "an ordinance setting forth the terms of the contract, and then approved by the necessary vote, *and accepted in writing by the persons proposing to build the works,* was all that was necessary to make a perfect and complete contract." (emphasis ours) [26 S.W. at 1027]

*Aurora Water Co.* stated the following in support of its rejection of the single document argument:

Under the rigid rule established by the statute of frauds, it was not necessary, in order to make a contract binding, that it should be all contained in one paper signed by the party to be charged; but the terms of the contract may be contained in one paper, and the signature may be found in some other paper, provided that such second paper properly refer to the terms of the containing paper. Fry, Spec.Perf. (3d Ed.) § 520. Numerous instances have occurred where letters have constituted the contract, and the written evidence of and acceptance of it. Id., §§ 270, 529. It surely was never intended by the legislature that a rule of greater stringency should be applied in instances like the present than in those just instanced. [Id., 955–56].

The Missouri cases make clear, however, that plaintiffs' argument, based upon its reading of *Burger v. City of Springfield,* 323 S.W.2d 777 (Mo.Sup.Ct.1959) that "it is obvious that the test for compliance with the need for writing is the same in a statute of frauds question as it is in compliance with Section 432.070" is untenable. *Aurora Water Co.* and its progeny, including, but certainly not limited to *Hoevelman,* apply general statute of frauds principles only to the extent of rejecting the early "single document" Missouri rule of decision.

■ *Kansas City v. Rathford,* 353 Mo. 1130, 186 S.W.2d 570 (1945), for example, makes clear that a contract entered into in violation of present Section 432.070 is void *ab initio* and that, unlike a contract entered into in violation of the general statute of frauds, cannot be enforced in any manner "on the theory of a ratification, estoppel or implied contract." ·186 S.W.2d at 574. *Rathford* expressly held, directly contrary to plaintiffs' argument, in this case, that:

The effect of the failure to comply with these mandatory provisions of statute and charter transcends the effect of the Statute of Frauds, which prohibits enforcement of a contract within its terms, and where part performance ousts the application of the statute. *Fleshner v. Kansas City,* 348 Mo. 978, 156 S.W.2d 706. The provisions safeguard against fraud and peculation, and specifically regulate the mode by which the business of a municipality is to be transacted. [186 S.W.2d at 574]

*Fleshner v. Kansas City,* 348 Mo. 978, 156 S.W.2d 706 (1941), cited and relied upon in *Rathford,* held:

Nor may a void contract be likened to a contract within the Statute of Frauds where part performance ousts the application of the statute. The latter is not prohibited from being made but is only prohibited from being enforced. It is not void, it is simply unenforceable.[6]

The appellants in *Allen v. City of Fredericktown,* 591 S.W.2d 723 (Mo.App.1979), relied upon *Aurora Water Co.* and *Burger v. City of Springfield* in an effort to reverse the trial court's judgment in favor of the City based upon that court's finding that no written contract existed between the parties which had been executed in compliance with Section 432.070. The appellants in *Allen* grounded their action on a municipal ordinance which provided that, under certain conditions, a developer of a subdivision could recover the cost of the installation of water and sewer lines.

■ The plaintiff developer in *Allen* conceded that no written contract had ever been executed as required by Section 432.-070. He, however, presented arguments not dissimilar from those presented by plaintiffs in this case. Appellants in *Allen*

---

**6.** *See* also *Donovan v. Kansas City,* 352 Mo. 430, 175 S.W.2d 874 (1943) and *Kansas City v. Halverson,* 352 Mo. 280, 177 S.W.2d 495 (1943), for cases articulating and applying the same Missouri rule of decision. In *Halverson,* the court stated that *"Donovan v. Kansas City,* Mo.Sup. 175 S.W.2d 874, is to the effect that

municipal contracts or obligations [which] contravene mandatory statutory provisions, cannot be made legally, are wholly void and are of no legal effect, as much so as municipal contracts not within the scope of the municipality's powers; ..." [177 S.W.2d at 498]

argued that "the existence of Ordinance No. 202 providing for reimbursement of water and sewer line expenses, creates a unilateral or executory contract which needs only some action or performance by appellants to complete the contract with the ordinance serving as the written document." [591 S.W.2d at 725]. Appellants in *Allen,* as do plaintiffs in this case, also attempted to rely on "the fact that the mayor and city clerk did execute certain documents indicating their approval of the plans submitted, albeit the Board of Aldermen had not enacted the requisite legislation for approval." [*Id.*] And, finally, appellants argued in *Allen* that "conversations between the appellants and the City's water works manager in which there was no disavowal of the City's liability for payment under Ordinance No. 202 ... [supported] their position." [*Id.*]

In rejecting all those arguments, the court in *Allen* first noted that on the facts, there simply was no writing other than the ordinance which could be said to meet the mandatory requirements of Section 432.070. *Allen* concluded that the ordinance itself could not be said to be a written contract within the meaning of the statute. *Allen* expressly held that:

> The situation in this case is unlike that in *Aurora Water Co. v. City of Aurora, supra,* where the ordinance—a contract in itself—contained complete contract provisions, including cost of items and detailed specifications. Ordinance No. 202 cannot serve as any kind of paradigm for a contract. It is, at most, the authority which could lead to the preparation of a written contract for the construction and reimbursement provisions for sewer and water lines in a subdivision. The ordinance cannot under any circumstances be considered to constitute the writing demanded by § 432.070. [*Id.*]

As we have noted above, *Hoevelman* must be counted as one of the progeny of *Aurora Water Co.* We find and conclude that the dictum quoted and relied upon by plaintiffs in that case cannot be said to support their argument in opposition to defendant's motion directed to Count I. We therefore reject plaintiffs' argument based on that case.

In regard to *Burger,* the only other case cited and relied upon by plaintiffs, *Allen* held that:

> *Burger v. City of Springfield,* 323 S.W.2d 777 (Mo.1959), cited by appellants, also fails to supply sufficient succor for their position that Ordinance No. 202 provides the writing necessary to comply with the mandate of § 432.070, for in *Burger* there were other written instruments of sufficient specificity to compliment the ordinance and form a written contract. Such is not the case here.... Other cases relied on by appellants are similar to *Burger* and *Aurora* and thus not congruent with the situation in this case. [*Id.*]

*Allen* further noted that "appellants continue to argue that they had fully performed all conditions of the contract by asserting Ordinance Nos. 202 and 68–10 as the basic written contract and their acceptance and performance of the conditions contained in the ordinances," and that "appellants dwell on the fact that the mayor and city clerk approved certain of the plats." [591 S.W.2d at 726]. Those arguments, which are not basically dissimilar to the arguments presented by plaintiffs in regard to Count I, were rejected by the *Allen* court for the reason that "certainly, more than the mayor's and city clerk's imprimaturs or conversations with a municipal employee unauthorized to speak for the City is necessary to raise any writing to the status of an effective written contract within the meaning of § 432.070 or to qualify as a binding authorization or approval of contract conditions by the City." [*Id.*]

We are satisfied that all of plaintiffs' arguments in opposition to defendants' motion for partial summary judgment as directed to Count I, as those arguments are based on Section 432.070, are untenable and must be rejected under applicable and controlling Missouri law. We so find and conclude.

### V. *Discussion of Count II*

 In regard to Count II—Interference with Contract—defendants contend that "as a matter of law, RCA and CIT cannot be liable in tort for interfering with a proposed contract between their wholly owned subsidiary, All-Steel, and plaintiffs." Defendants argue that the "sole material fact" that "All-Steel is a 100% percent-owned subsidiary of CIT and RCA" is not in dispute and that "no claim for contractual interference can arise from directions of a parent to its 100 percent-owned subsidiary." (Dfs.' Suggestions, p. 25). *Nola v. Merollis Chevrolet, Kansas City, Inc.,* 537 S.W.2d 627 (Mo.App.1976) is relied upon to support that argument. Neither *Nola* nor the cases from jurisdictions other than Missouri can be read so broadly. *Nola* does not even cite the leading Missouri case of *Downey v. United Weather Proofing,* 363 Mo. 852, 253 S.W.2d 976 (1953), in which Missouri first adopted the rationale of Section 766 of the Restatement of Torts.

 Defendants' second Count II argument contends that because "no contract existed between All-Steel and plaintiffs, there clearly can be no liability for interference with that alleged contract" (Dfs.' Suggestions, p. 25). That argument is equally untenable. The following rule of decision stated in *Downey* has consistently been applied in all the Missouri cases and in all federal cases applying Missouri law:

The right of recovery for inducing a breach of a contract is but one instance of the protection which the law affords against unjustified interference in business relations. An existing contract may be a basis for greater protection, but some protection is appropriate against unjustified interference with reasonable expectancies of commercial relations even where an existing contract is lacking. [253 S.W.2d at 980]

Defendants' third Count II argument is based on well established principles of Missouri law which were most recently applied in *Francisco v. Kansas City Star Co.,* 629 S.W.2d 524 (Mo.App.1981). In reversing outright a judgment based on a jury verdict of $43,327.00 for damages upon a claim of tortious interference, the *Francisco* court held that:

Interference with contractual or business relations is a tort recognized under Missouri law. This was declared by our state Supreme Court in *Downey et al. v. United Weather Proofing,* 363 Mo. 852, 253 S.W.2d 976 (1953) which held that in order for such claim to be sustained, a plaintiff must establish five elements. Those elements are:

(a) a contract or valid business relationship or expectancy;

(b) knowledge by the defendant of the contract or relationship;

(c) intentional interference by the defendant which induces the breach of contract or relationship;

(d) the absence of justification; and

(e) resulting damages.[7]

In determining whether plaintiff had made a submissible case in regard to the requisite elements of intent and whether plaintiff carried the burden of proving plaintiff's claim of absence of justification, *Francisco* held that:

Liability under this tort cannot be predicated upon speculation, conjecture or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis. A plaintiff must generate substantial evidence supporting each and every element of this cause of action. *Tri-Continental Leasing*

---

**7.** *Francisco* added that "that the foregoing elements are still required, *see Fischer, Etc. v. Forrest T. Jones and Co.,* 586 S.W.2d 310, 315 (Mo. banc 1979); *Salomon v. Crown Life Insurance Co.,* 536 F.2d 1233, 1238 (8th Cir.1976), *cert. denied* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); *Harber v. Ohio National Life Ins. Co.,* 390 F.Supp. 678, 683 (E.D.Mo. 1974), *aff'd.* 512 F.2d 170 (8th Cir.1975);

*Squirtco v. 7-Up Co.,* 628 F.2d 1086, 1092 (8th Cir.1980); *M.J.S. Resources, Inc. v. Circle G. Co.,* 506 F.Supp. 341, 348 (E.D.Mo.1980)."

The citation of the federal cases applying Missouri law, which we will later discuss, is a recognition on the part of Missouri courts that the federal courts have correctly stated and applied Missouri law in the federal diversity cases cited.

*Co. v. Neidhardt,* 540 S.W.2d 210 (Mo. App.1976). [629 S.W.2d at 529]

*Tri-Continental* was also cited by the *Francisco* court to support the principle that "under the law of our state, a plaintiff bears the burden of proving that the defendant 'actively and affirmatively took steps to induce the breach.' *Tri-Continental* at 216." And, more important, *Francisco* quoted with emphasis the following principle stated in *Gerstner Electric, Inc. v. American Insurance Company,* 520 F.2d 790, 794 (8th Cir.1975): "*There must be proof that the defendant not only intended to commit an act which is ascertained to be wrongful but also that he knew it was wrongful at the time he did it.* (emphasis added by the *Francisco* court)." [*Id.*]

 In regard to the essential element of "absence of justification," *Francisco* makes clear that the burden of pleading and proving that element by substantial rather than speculative evidence rests upon the plaintiff. *Francisco* held in that regard that:

> In Missouri, absence of justification is an element of the claim of wrongful or tortious interference of contract and a plaintiff carries the burden of proof on this issue, *Fischer* and *Gertsner, supra; Cady v. Hartford Accident and Indemnity Co.,* 439 S.W.2d 483, 485 (Mo.1969) and *C. and M. Developers, Inc. v. Berbiglia,* 585 S.W.2d 176, 184 (Mo.App.1979). Our state is among those jurisdictions which includes, as a requisite part of the cause of action for such claims, that plaintiff plead and prove the acts of a defendant inducing or causing a breach "be without justification." *Pillow v. General American Life Insurance Co.,* 564 S.W.2d 276, 280 (Mo.App.1978). [629 S.W.2d at 533–34].

Plaintiffs' suggestions in opposition fail to direct the Court's attention to any factual data in regard to how plaintiffs expect to carry the burden of proving the essential element of an absence of justification in connection with its Count II claim of tortious interference. Plaintiffs' discussion of the legal principles applicable to Count II is equally superficial.

On the other hand, we are satisfied that defendants' argument that "whether or not RCA and CIT were 'privileged,' had the requisite 'intent,' or acted 'without justification' in this matter are purely legal issues" [Ds.' reply, p. 17] and defendants' argument that "as a matter of law, RCA and CIT cannot be liable for tortious interference with the contract of their wholly owned subsidiary, All-Steel," [*Id.,* p. 19] are not tenable. Defendants' argument that it is entitled to summary judgment by proving only that All-Steel was at all pertinent times a wholly owned subsidiary of CIT and by proving that CIT, and "thereby" All-Steel, became wholly owned subsidiaries of RCA on January 31, 1980, establishes, as a matter of law, that plaintiffs cannot establish the essential elements of either intent or tortious interference, is untenable.

The federal cases applying Missouri law cited and relied upon in *Francisco* fully establish the difficulties which any plaintiff faces in attempting to recover on a tortious interference claim. *Harber v. Ohio National Life Ins. Co.,* 512 F.2d 170 (8th Cir.1975), for example, affirmed a judgment in favor of the defendant based on the district court's finding that the plaintiff had failed to prove the element of absence of justification. The Court of Appeals held in *Harber* that "although Harber's complaint may have stated a cause of action for tortious interference ... the absence of justification for the defendant's conduct is an essential element in such a claim for relief under Missouri law" [512 F.2d at 175].

*Salomon v. Crown Life Ins. Co.,* 536 F.2d 1233 (8th Cir.1976), for further example, reversed outright a district court judgment of approximately $900,000.00 actual damages and $750,000.00 punitive damages on the ground that the plaintiff had simply failed to establish its claim of tortious interference under Missouri law. *Salomon* concluded that the district court's findings to the contrary were clearly erroneous under the factual circumstances presented.

In regard to the burden resting upon a plaintiff in a tortious interference case, the Court of Appeals held in *Salomon* that:

It was incumbent upon the plaintiffs below to prove that Crown "maliciously or without justifiable cause" induced the breach of the relationship between Salomon and his three brokers. Under applicable Missouri law, "[t]he term 'maliciously' in this connection alludes to malice in its technical legal sense, that is, the intentional doing of a harmful act without justification or excuse." *Downey v. United Weather Proofing, supra,* 253 S.W.2d at 980. [536 F.2d at 1240]

In regard to the element of absence of justification, the Court of Appeals concluded that "our examination of the record convinces us that the Salomon appellees failed to establish an absence of justification as required under the *Harber* formulation" and that "justification for intentional interference such as is alleged in this case can be provided through proof that the efforts were undertaken to protect a valid economic interest." [Id. at 1242] [8]

While the Court of Appeals' discussion in *Salomon* of the requisite element of damages in a tortious interference case was by way of dictum, Judge Nangle of the Eastern District of Missouri was required to deal directly with the essential element of damages in *M.J.S. Resources, Inc. v. Circle G. Coal Co.,* 506 F.Supp. 341 (E.D.Mo.1980). In that case Judge Nangle first set forth the five essential elements of a tortious interference claim under Missouri law. *See* 506 F.Supp. at 348. He then concluded for reasons stated in detail that plaintiff in that case had, in fact, established all of

those elements except the element of damages.

After concluding that plaintiff in *Circle G. Coal Co.* had established, on the facts, the fourth element that defendant "was not justified in its actions," Judge Nangle stated that "the last element of plaintiff's proof is showing ascertainable damages resulting from defendant's actions." He found and concluded that "[t]his element has not been satisfied" for the reason that:

In order to recover lost profits, plaintiff must produce evidence that affords a sufficient basis for estimating their amount with reasonable certainty. *Vigano v. Wylain, Inc.,* 633 F.2d 522 (8th Cir. 1980); *Red-E-Gas Company v. Meadows,* 360 S.W.2d 236 (Mo.App.1962)

[P]roof of the income and expenses of the business for a reasonable time anterior to its interruption, with a consequent establishing of net profits during the previous period, is indispensable. *Coonis v. Rogers,* 429 S.W.2d 709, 714 (Mo.1968).

See, also *Rich v. Eastman Kodak Company,* 583 F.2d 435, 437 (8th Cir.1978). [506 F.Supp. at 349]

Judge Nangle applied those principles of applicable Missouri law and directed that judgment be entered in favor of the defendant for the reason that:

Of course, there is no such proof in this case, as plaintiff did not conduct any business either before or after defendant's actions. This Court simply can not accept plaintiff's attempt to quantify its

---

8. In light of the plaintiffs' superficial treatment of the damages question fully briefed by defendants in support of the pending motion for summary judgment, it is appropriate that counsels' attention be directed to Footnote 5 on page 1243 of *Salomon* which stated the following:

In view of our finding that no liability was established on the tortious interference claim we do not reach the damage issue in this case. We note, however, that the Salomon appellees had the burden in the district court to prove some damage attributable to the wrong they suffered at the hands of Crown. The district court's finding was that Crown

wrongfully subverted and brought about a breach in the relationship between Salomon and the three brokers. Thus, any showing of damage must necessarily arise from the loss occasioned by Crown's acts. However, the actual damage award by the district court relied exclusively upon expert testimony and economic projections which were premised upon the continuation of the general agency contract over a period of 20 years. We find no basis for the use of such a standard. . . . Similarly, we find no basis whatsoever for the district court's award of $750,000 in punitive damages.

damages—the figures are purely speculative and conjectural. *Rich, Id.*[9]

*SuperTurf, Inc. v. Monsanto Co.,* 660 F.2d 1275 (8th Cir.1981) is the most recent Eighth Circuit case in which the Missouri law applicable to Count II was applied. Plaintiff SuperTurf attempted to recover damages on both a federal antitrust claim and on a pendent Missouri state law claim for tortious interference. The Court of Appeals affirmed a judgment based on a jury verdict for the defendant but reversed and remanded the pendent tortious interference claim for a new trial.

Although it took six weeks to try *Super-Turf* in the district court, the Court of Appeals' opinion makes it obvious that plaintiff in that case had not properly researched its Missouri tortious interference claim in either the district court or the Court of Appeals. The Court of Appeals noted that SuperTurf "complains that the district court should not have, in effect, forced the plaintiff to elect between its antitrust and common law tort claims at trial." SuperTurf was, in effect, forced by the district court to elect which one of its two claims be submitted to the jury. It elected to abandon its pendent tort claim and to submit its antitrust claim to the jury.

Monsanto attempted to defend the district court's action by arguing that "any error committed by the trial court in failing to instruct the jury on plaintiff's tort claims was 'harmless' because the plaintiff did not prove these claims at trial." The Court of Appeals then noted that "although the appellant vigorously maintained at oral argument that this error was not harmless, the sketchy nature of its brief in this regard impeded the Court from evaluating whether, in fact, there was sufficient evidence introduced at trial to go to the jury on plaintiff's tort claims."

In reflection of its need for appropriate briefs from the parties, the Court of Appeals directed that SuperTurf "submit a list of the specific 'business expectancies' with which the defendant allegedly tortiously interfered, and to refer the Court to those portions of the voluminous record (47 volumes of transcript and over 3,000 exhibits) in which evidence supporting these claims could be found." Monsanto was, of course, "given an opportunity to respond to this submission." The Court of Appeals' opinion shows that SuperTurf "listed nine stadia installations where events giving rise to its state claims allegedly occurred."

In an obvious effort to ensure that a third trial of SuperTurf's tort claim would be avoided, the Court of Appeals reviewed the supplemental briefs of the parties and discussed the applicable Missouri law in detail. It stated first that:

The law of Missouri does afford protection against unjustified interference with reasonable expectancies of commercial relations even where an existing contract is lacking. See *Downey v. United Weather Proofing,* 363 Mo. 852, 253 S.W.2d 976, 980 (1953).

It then set forth the five essential elements which a plaintiff must prove in order to establish a prima facie case of tortious interference in exactly the same language as those elements are stated in *Francisco, Harber,* and *Salomon.*

After a full review of the evidence in regard to the nine stadia to which its attention had been directed by the supplemental brief procedure ordered in the Court of Appeals, the court concluded that "a reasonable jury could have found that the plaintiff established a prima facie case of

---

**9.** Judge Nangle added that "plaintiff's claims that the coal could have been sold are not based on any evidence and, in fact, are contrary to the facts herein. There is no proof to support the sales price asserted by plaintiff. Likewise, there is no proof of the existence or non-existence of expenses which would be incurred. Under these circumstances, plaintiff has proved no damages." And in regard to whether plaintiff could recover punitive damages, it was concluded that "since no actual damages were proved, plaintiff is likewise not entitled to punitive damages. *Coonis v. Rogers,* 429 S.W.2d 709 (Mo.1968); *Longmore v. Merwin,* 585 S.W.2d 545 (Mo.App.1979). In any event, the evidence herein clearly would not justify the imposition of punitive damages." [506 F.Supp. 349–50]

tortious interference with business expectancies regarding only one stadia installation: the football field at Boise State University." [*Id.* at 1285]

As to that single stadium installation it was concluded in connection with the first three elements of SuperTurf's claim that "a jury could reasonably conclude from ... evidence in the record that SuperTurf had a valid business expectancy to procure the Boise State contract by competitively pricing its product, and that the defendant knew of SuperTurf's intent to successfully compete," and that "a jury could also reasonably conclude that Monsanto successfully and intentionally interfered with this expectancy, resulting in the loss to SuperTurf of profits it would have obtained by winning the contract." In regard to whether SuperTurf made a submissible case in regard to proving the fourth element of an absence of justification, the Court of Appeals concluded the following on that factual issue:

> We concede that a jury might be reluctant to find that the plaintiff established an "absence of justification" for defendant's conduct. The Missouri common law recognizes that intentional interference with plaintiff's business expectancies may be "justified" if defendant's aim is "to

protect its valid economic interests." *Salomon v. Crown Life Ins. Co., supra,* 536 F.2d at 1242. The "privilege" to vigorously compete is not unlimited, however. [citing and quoting from] *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co., supra,* 586 S.W.2d at 315–316.[10]

 *SuperTurf v. Monsanto* is important in ruling defendants' pending motion directed to Count II for two reasons. First, that case requires that this Court reject defendants' argument that the questions of "whether or not RCA and CIT were 'privileged,' had the requisite 'intent,' or acted 'without justification,' in this matter are purely questions of law." Second, and perhaps more important for purposes of directing further proceedings, *SuperTurf v. Monsanto* outlined procedures under which the legal question of whether plaintiffs will be able to make a submissible case of tortious interference may be adopted by this Court in order that those questions may be determined prior to what obviously would be a long and expensive trial.[11] We will discuss that question in a later part of this memorandum opinion.

## VI. *Discussion of Count III*

Count III of plaintiffs' pending petition, after incorporating all common paragraphs

---

**10.** The Court of Appeals added that "the *Fischer* holding accords with the Restatement (2d) of Torts § 768, which provides that one's competitive aim justifies intentional interference with prospective contractual relations only if ' * * * (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade.' "

In refusing to conclude that Monsanto was "justified" *as a matter of law,* the Court of Appeals held that "We are reluctant to hold as a matter of law that Monsanto's alleged tortious interference at Boise State was 'justified' by *its* competitive aims. The jury should have been given an opportunity to consider Super-Turf's state law claim regarding this installation. We, therefore, reverse and remand for a new trial limited to evidence relating to the events surrounding the purchase and installation of AstroTurf at Boise State University."

In regard to SuperTurf's claim in regard to the other eight stadia, the Court of Appeals concluded that "there is no evidence to support SuperTurf's contention that Monsanto intentionally interfered with its business expectan-

cies regarding the eight other stadia installations at issue." [*Id.* at 1286]

**11.** The lengthy deposition of Cornelius W. May of HUD, for example, noticed and taken in this case by the plaintiffs in Washington on May 11, 1982, illustrates the excessive amount of time and expense already expended in this litigation. For all practical purposes, the authenticity of all of the documentary evidence identified by that witness should have been, as defendants' and HUD counsel suggested, the subject of a stipulation of the parties. See pages 34 and 86 of the May deposition. Plaintiffs' counsels' suggestion that his only purpose for going through all of the HUD documents was because he thought "it was difficult for a jury to understand the Grant Agreement without having somebody of May's caliber explain what those various schedules were designed to do," see page 86 of the May deposition, is obviously untenable. The legal effect of the HUD documents presents questions of law for the Court, rather than a jury's, determination.

1 through 18 and paragraph 2 of Count I and paragraph 3 of Count II, alleged the following in paragraph 2 of Count III:

2. Defendant All-Steel and CIT negligently misrepresented to Warrensburg and IDA that a manufacturing facility would be placed in the Warrensburg Industrial Park at the time of which misrepresentations All-Steel knew or should have known that Warrensburg and IDA would act to their detriment in reliance upon these misrepresentations, and Warrensburg and IDA did act to their detriment in reliance on these misrepresentations and did suffer damage, all as more fully set forth as hereinbefore and hereinafter.

Plaintiffs seek $5,000,000.00 actual damages from All-Steel; $2,000,000.00 punitive damages against All-Steel; and $35,000,000.00 punitive damages against CIT.

Defendants argue in support of their summary judgment motion directed to Count III that with all their discovery completed, plaintiffs are unable to support their allegation of negligent misrepresentation. Defendants concede, as they must, that RCA took over CIT on January 31, 1980 and that although All-Steel and CIT believed and hoped that RCA would approve the Warrensburg project, such approval was never forthcoming. Defendants contend any failure of the defendants to disclose RCA's refusal to approve was not a misrepresentation of fact.

Plaintiffs' suggestions in opposition assert, for reasons never stated, that "on Count III, the basic question will be the accuracy of the representation made by All-Steel and CIT that an All-Steel manufacturing facility would be built in Warrensburg Industrial Park according to the terms of the documents submitted to HUD by the parties, whether or not those documents rise to the level of an enforceable contract." Plaintiffs contend, again without citation of any legal authority, that "there can be a jury question of misrepresentation from the simple act of passing corporate resolutions on January 31, 1980 to bind a deal that could not go forward without subsequent RCA approval." Plaintiffs, of course, cite no factual or legal authority to support their multimillion dollar claims for actual and punitive damages which they claim under their "negligent misrepresentation" count, as alleged in Count III.

We are satisfied that the orders we enter today will place plaintiffs' Count III claim in a more appropriate focus for possible pretrial determination. If, under applicable Missouri law, plaintiffs can set forth the *material* facts in the responses required by those orders that are actually in dispute, defendants' motion for summary judgment will be denied. If plaintiffs' response fails to set forth material facts in issue, defendants' motion directed to Count III will be granted.

Any trial of Count III which may be necessary would nevertheless be greatly simplified and expedited for the reason that the areas of factual and legal dispute will be precisely defined by the parties' compliance with the orders we shall enter directing further proceedings in connection with all counts other than Count I of plaintiffs' petition.

VII. *Discussion of Plaintiffs' Pending Alternative Motion In Regard to the Filing of a First Amended Complaint*

We are satisfied that it is premature to rule plaintiffs' motion for declaration of right to file First Amended Complaint without leave of Court or, in the alternative, for leave of Court to file First Amended Complaint. We think it obvious that the orders we will enter directing further procedures will put in proper focus the question of whether plaintiffs should be permitted to substitute a new eight count complaint which would inject still additional legal theories into litigation already difficult to process. The orders directing further proceedings will afford plaintiffs a full and fair opportunity to demonstrate whether, under the factual circumstances developed during discovery, and in accordance with plaintiffs' precise statement of the applicable Missouri law, plaintiffs should be granted leave to file an amended complaint. We shall therefore defer entering any order in

connection with plaintiffs' motion until after the parties comply with orders which will be entered directing further proceedings.

### VIII. *Reasons Why Orders Directing Further Proceedings Will Be Entered*

It should be stated as an introductory matter that plaintiffs take the position in regard to all three counts of its pending petition that "the facts which will support any one count also support the others" (Pls.' Suggestions, p. 50). Indeed, plaintiffs add on the same page they "have prepared a First Amended Complaint which will add some theories of recovery, but the added theories are based on the same facts as the original three counts." Plaintiffs apparently assume, as plaintiffs have apparently assumed in the past, that they will not be required to define and sort out their multiple legal theories before trial and that they will not be required to comply with the requirements of Rule 56 of the Rules of Civil Procedure in their response to defendants' motion for summary judgment. For it is clear that plaintiffs contend that "upon the trial of this cause, the evidence very nearly will be the same with or without some of the counts" [*Id.* pp. 50–51].

In spite of the obvious importance of plaintiffs' need to demonstrate their ability to make a prima facie case in support of their multi-million dollar claims for damages, plaintiffs' additional suggestions in opposition filed November 1, 1982 frankly concede that "plaintiffs did not respond in their original suggestions in opposition to the motion for summary judgment to that part of the motion which dealt with damages" [P. 1].

Plaintiffs make the untenable argument in their most recently filed suggestions that they had "simply asserted in their original suggestions that a motion for summary judgment was not the appropriate method to deal with disputes about the amount of damages" [P. 1]. Indeed, plaintiffs concede even in that their most recent filing, they approach the question of damages "only . . . in a general way" for the asserted untenable reason that "plaintiffs still contend that a trial with the opportunity to present all relevant facts is the appropriate way to deal with these questions." [P. 1.] [12]

Chief Judge Lay has recently suggested that the district courts in the Eighth Circuit follow summary judgment procedures which have been successfully utilized in the Second Circuit in general, and in the Southern District of New York, in particular. It is therefore appropriate that we direct attention to three district court opinions in *Morse v. Swank, Inc.,* which was processed in the Southern District of New York. Plaintiff in that case, like plaintiffs in this case, unduly complicated his right to recover damages by attempting to assert multiple legal theories which plaintiff contended were supported by essentially the same set of facts. Plaintiff in that case alleged (1) a violation of the antitrust laws, (2) breach of contract, (3) tortious interference with a contract, (4) fraud, and (5) negligence.

Judge Tenney of the Southern District of New York considered motions for summary judgment filed by all defendants in *Morse v. Swank, Inc.,* 459 F.Supp. 660 (S.D.N.Y. 1978). The present Second Circuit standards for summary judgment are set forth on page 664. Those standards are basically the same standards as the present Eighth Circuit standards. While Judge Tenney granted summary judgment only in regard to one set of defendants on plaintiff's alleged fraud and negligence causes of action, it is important to trace the treatment given plaintiff's tortious interference claim.

Judge Tenney concluded that under New York law, "the tortious interference prohi-

---

**12.** The "general way" in which plaintiffs have thus far responded to the damage portion of defendants' suggestions in support of their pending motion for summary judgment is clearly an insufficient response to the factual and legal arguments made by defendants in their supporting suggestions. As will be noted later in the text, plaintiffs will be required to stand up and be counted in regard to what legal theory they believe they are entitled to recover and on what factual basis they believe that they will be able to make a prima facie case to support each of their multi-million dollar damage claims.

bition extends to mere negotiations" and whether the defendants could be held liable under that theory "is a factual question." Because, at that time, the parties had not engaged in any discovery, defendants' motion for summary judgment was denied in regard to that count.

*Morse v. Swank, Inc.,* 493 F.Supp. 110 (S.D.N.Y.1980), decided two years later, however, shows that "after the completion of discovery, the defendants ... moved for summary judgment 'on plaintiff's antitrust count and on plaintiff's tortious interference cause of action.'" Judge Tenney considered the evidentiary data developed pursuant to discovery, analyzed the applicable New York law relating to plaintiff's tortious interference claim (which is not essentially different from that of Missouri) and concluded that the defendants' "interference, to the extent it occurred, was privileged." Judge Tenney therefore granted defendants' motion for summary judgment in regard to that count for the reason that plaintiff "Morse has not raised a genuine issue as to the wrongfulness of any interference by Swank in whatever agreement or relations Morse had with the Cardin defendants."

Judge Tenney expressly noted that "Morse sets forth numerous circumstances from which he believes a jury could infer tortious interference." He concluded, however, that, as a matter of law, the designated circumstances were simply insufficient to "raise an issue of fact as to the wrongfulness of or lack of justification for Swank's alleged interference with Morse's contractual or precontractual relations with the Cardin defendants."

All of plaintiff's claims in *Morse v. Swank, Inc.,* except only plaintiff's garden variety action for breach of contract, were thus eliminated by appropriate application of the summary judgment procedures pro-

vided by Rule 56. *Morse v. Swank, Inc.,* 520 F.Supp. 829 (S.D.N.Y.1981), reported still another year later, shows that plaintiff's action, filed in 1977, was finally tried as a simple breach of contract action in 1981 and that the plaintiff was awarded a $435,-000 verdict for breach of contract. Judge Tenney's 1981 decision dealt only with the question of how interest on that judgment should be computed.

The procedures directed by the Court of Appeals in *SuperTurf* suggest that plaintiffs in this case be directed and required to follow appropriate summary judgment procedures which will enable this Court to evaluate whether, in fact, plaintiffs have sufficient evidence to make a prima facie case for the jury in regard to not only plaintiffs' tortious interference claim, as alleged in Count II of plaintiffs' pending petition, but also in connection with Count III in plaintiff's pending petition.

In light of plaintiffs' concession that all the legal theories they wish to add by way of a First Amended Complaint "are based on the same facts as the original three counts," it is clear that compliance with the orders to be entered directing further proceedings in regard to all of the new counts which plaintiffs seek leave to file will provide an appropriate procedure to determine whether plaintiffs should be permitted to inject still additional legal theories into the pending litigation.

Accordingly, appropriate orders will be entered which will require plaintiffs to prepare and file an appropriate response which will set forth plaintiffs' view of the applicable Missouri law or other legal authority which sets forth the essential elements of each cause of action which plaintiffs purport to allege in Counts II and III of plaintiffs' pending petition, and each of the various counts in plaintiffs' proposed eight count First Amended Complaint.[13]

---

13. It is contemplated, for example, that in connection with Count II of plaintiffs' pending petition, that plaintiffs legal response would set forth the five essential elements of an action for tortious interference as those elements are set forth in *Francisco* and in the various federal cases which we have discussed above. It is precisely that sort of statement that the Court directs plaintiffs to make and to support by appropriate citation of legal authority.

In addition, as required by Rule 56(e), plaintiffs' factual response shall, by appropriate and

■ Plaintiffs, in a manner similar to the procedures directed by the Court of Appeals in *SuperTurf* will also be required to direct the Court's attention to all documentary evidence and deposition testimony developed during discovery, with appropriate citations to specific pages in a particular document or deposition, which plaintiffs believe is sufficient to establish a prima facie case in regard to each of the elements in each cause of action which plaintiffs have alleged in Count II and Count III of plaintiffs' pending petition and which they propose to allege in each of the eight counts contained in the First Amended Complaint which plaintiffs seek leave to file.

■ Counsel may, of course, prepare and file as separate documents such affidavits as are permitted by the various paragraphs of Rule 56 to support their contention that plaintiffs can make a prima facie case in regard to each element in each alleged cause of action.[14]

In light of the obvious difficulties plaintiffs face in regard to proving their multimillion dollar damage claims, plaintiffs shall pay particular attention both to their legal theory of damages and the factual data upon which plaintiffs rely to support the damage claims asserted in each of their various alleged causes of action.

Consistent with the procedures directed by the Court of Appeals in *SuperTurf*, and as authorized by the various subparagraphs of Rule 56, the defendants will be afforded an appropriate opportunity to file a legal and factual statement in response to plaintiffs' response and plaintiffs will be afforded an appropriate opportunity to file a statement in reply.

precise reference to the record, set forth specific facts which they contend would support plaintiffs' prima facie case in regard to Count II and which would show that there is a genuine issue for trial in regard to the facts relied upon by defendants to support their pending motion for summary judgment directed to Count II.

Plaintiffs are to understand, of course, that they are expected to separately state and support their respective legal and factual bases in regard to each cause of action alleged in Count

Because of the difficulties heretofore encountered in directing pretrial procedures in this case, the Court will, upon request, convene a further pretrial conference in order to make certain that counsel for both sides fully understand what is required of them by the orders we will enter directing further proceedings.

## IX.

For the reasons stated, it is

ORDERED (1) that, within thirty (30) days, plaintiffs shall prepare, serve, and file a response to defendants' pending motion for summary judgment directed to Counts II and III of plaintiffs' pending complaint which will set forth:

(a) Plaintiffs' view of the applicable Missouri law or other legal authority which shall set forth the essential elements of each cause of action which plaintiffs purport to allege in Counts II and III of plaintiffs' pending petition.

(b) In a separate part of plaintiffs' response, plaintiffs shall direct attention to all documentary evidence and deposition testimony developed during discovery, with appropriate citations to specific pages in a particular document or deposition, which plaintiffs believe is sufficient to establish a prima facie case in regard to each of the elements in each cause of action which plaintiffs have alleged in Count II and Count III of plaintiffs' pending petition. Plaintiffs' response shall clearly set forth the specific facts which plaintiffs believe will show that there is a material issue for trial, as provided in Rule 56(e) of the Rules of Civil Procedure.

III and in all eight counts of their proposed First Amended Complaint in the same manner.

14. The blanket affidavit of John Vinson, attached to plaintiffs' suggestions in opposition to defendants' motion for summary judgment, does not comply with the requirements of Rule 56. That affidavit does no more than attempt to support counsels' conclusory view of the factual circumstances which plaintiffs apparently hope to establish at trial.

Plaintiffs may, of course, prepare and file as separate documents such affidavits as are permitted by the various paragraphs of Rule 56 to support any factual contentions that plaintiffs may make in regard to each element in each cause of action alleged in Count II and Count III of their pending petition.

(c) Plaintiffs' response shall separately state their legal theory of damages in regard to each cause of action alleged in Count II and Count III and shall contain plaintiffs' citation of factual data upon which plaintiffs rely to support the essential element of damages alleged in each of the causes of action alleged in Count II and in Count III of their pending petition.

It is further

ORDERED (2) that plaintiffs, within the same time period, shall prepare, serve, and file a similar but separate legal and factual statement in regard to and in support of each cause of action which plaintiffs allege in each of the eight counts contained in the First Amended Complaint which plaintiffs seek leave to file. It is further

ORDERED (3) that defendants, within twenty (20) days after filing of plaintiffs' filings ordered in Orders (1) and (2) above, shall prepare, serve, and file a legal and factual statement in response to plaintiffs' filings. Defendants' factual statements may be supported by the filing of affidavits, as provided in Rule 56 of the Rules of Civil Procedure. It is further

ORDERED (4) that within ten (10) days thereafter, plaintiffs may file a statement in reply to defendants' filings, if they wish to do so. It is further

ORDERED (5) that if a pretrial conference is desired by either side, counsel for both sides shall confer and agree upon a date agreeable to themselves and, through the Court's law clerk, arrange a date agreeable to the Court for such a conference in order to make certain that counsel for both sides fully understand what is required of them by the orders entered directing further proceedings. It is further

ORDERED (6) that appropriate extensions of time will be considered for good cause shown. Opposing counsel shall be consulted for the purpose of reaching an agreement in regard to any extension desired before making application to the Court.